**In re Edward L. PENN, Patient, Appellant.**

**No. 24033.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 23, 1970.

Decided Dec. 14, 1970.

**664**

Mr. James E. Duggan, Legal Aid Agency, Washington, D. C., for appellant.

Mr. Philip L. Cohan, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry and John T. Kotelly, Asst. U. S. Attys., were on the brief, for appellee.

Before MacKINNON, ROBB and WILKEY, Circuit Judges.

MacKINNON, Circuit Judge:

Following a jury determination that he was mentally ill and likely to injure himself or others, appellant was committed to Saint Elizabeths Hospital under the District of Columbia Hospitalization of the Mentally Ill Act, D.C.Code § 21–545(b) (1967).[1] On this appeal, he urges that there was no competent evidence to support the finding that he was "likely to injure himself or others"; that hearsay evidence furnished the crux of the testimony in support of such conclusion and that his Sixth Amendment right to confrontation was thus violated. Finding no error, we affirm.

■ Two psychiatrists who had been examining appellant testified at the trial. Both testified that they were of the opinion that appellant was suffering from paranoid schizophrenia and was likely to injure himself or others. Both indicated that their opinions were based on personal observation and statements of appellant plus a series of occasions on which appellant had been involved in incidents of an assaultive nature. Their knowledge of such incidents was drawn from police reports, records kept in connection with appellant's eight prior admissions to mental institutions since 1960, and from statements made by appellant himself. Such evidence indicated the basis for some of his judgments, motivations and apparent confusion. In particular, the psychiatrists testified concerning two recent incidents in which appellant had arguments with people. In one he drew a penknife and in the other he went from the Washington Monument Grounds to his home and re-

[1]. If the court or jury, as the case may be, finds that the person is not mentally ill, the court shall dismiss the petition and order his release. If the court or jury finds that the person is mentally ill and, because of that illness, is likely to injure himself or other persons if allowed to remain at liberty, the court may order his hospitalization for an indeterminate period, or order any other alternative course of treatment which the Court believes will be in the best interests of the person or of the public. The Commission, or a member thereof, shall be competent and compellable witnesses at a hearing or jury trial held pursuant to this chapter. The jury to be used in any case where a jury trial is demanded under this chapter shall be impaneled, upon order of the court, from the jurors in attendance upon other branches of the court, who shall perform the services in addition to and as part of their duties in the court. (Sept. 14, 1965, 79 Stat. 756, Pub.L. 89–183, § 1, eff. Jan. 1, 1966.) D.C.Code § 21–545(b) (1967).

turned with a penknife, whereupon he was arrested by the police. Dr. Pugh testified that appellant admitted to him "he would have cut the man if the police had not been there." In the most recent incident he was arrested on a complaint at the Senate Office Building by Detective Cahill who testified that he

> asked Mr. Penn what was his trouble; and he told me he couldn't be helped, only by God.

> After a lengthy conversation in which I asked him what actually was the trouble with him, he said it all seemed to stem from the Crucifiction [sic] in Baltimore. I questioned him at length on this and he said that some time back he had been set upon by a party who took him and crucified him on Pratt street in Baltimore, Maryland, robbing him and taking his money.

> He also stated there was a conspiracy against him by the FBI, CIA and other Government Agencies; and he continued on and stated that Senator McGovern and Senator Robert Kennedy were getting him in line to be the next Martin Luther King.

One physician specializing in psychiatry at Saint Elizabeths Hospital testified he had examined appellant and his records, had talked with him every two or three weeks between October 24, 1969 and January 21, 1970 and had discussed with appellant his conduct with respect to a secretary to a man who had formerly been on the Staff of a United States Senator and whether he had

> threatened her and told her that he would kill every one on the [Senator's] staff. *He denied this but said that someone ought to kill every one except this particular secretary.* (Emphasis added).

This same psychiatrist concluded:

> I believe he has the same illness that he has had for the past ten years, and his illness has frequently resulted in assaultive behavior. * * * I

think that his dangerousness is preventable by means of interceding at this point.

Another psychiatrist-physician with thirty years' experience pointed out that in his opinion appellant's mental condition also constituted a threat to injure himself, *i. e.*, that he was dangerous to himself when he threatened others:

> I think one man's thinking that he is going to be executed like these other people were; that this man thinks that somebody else that he sees in a crowd can be that person who is going to do it; and that it may be a bit ludicrous and shows rather poor judgment to be carrying an open penknife around, but the idea is there to explode at some time or other. He threatened these bus drivers with a pistol [2] and returned with a penknife, but he returned; and I think someone could take him seriously sometime.

Appellant, on the stand, admitted having thought he had been crucified in Baltimore by some people. He said he had it investigated by B'Nai B'Brith and found out it wasn't so:

> * * * and I began to think that these people were real. One was a FBI Agent, one a CIA Agent and one a man and woman, and I was thinking it was these people and I went to B'Nai B'Brith and had it investigated. And I also went to Senator Barry Goldwater and had one of his staff investigate it and found out it wasn't so.

He also admitted he had opened his penknife in a bar during one incident discussed at trial and that the bus drivers he had threatened on one occasion did not have any weapons. Asked why he had gone home, obtained his penknife and then returned to confront the busmen at the *Washington Monument Grounds,* he replied, "I don't know. *I just felt obligated to go back.*" (Emphasis added).

There was all this evidence, and more, which indicates there was substantial

---

2. Dr. Bunge testified from the version appellant gave to him that, "He [appellant] said he was going to get them and he was going to shoot them and then he left."

competent evidence to support the finding by the jury. Appellant's testimony, while admitting that he was mentally ill, gave different versions of the recent knife incidents, claiming that, in both, he was acting in self-defense.[3]

■ We need not reach appellant's ultimate point—that a person cannot be committed under the Act *wholly* on the basis of hearsay testimony, even when such testimony concerns events or occurrences which have formed the basis for psychiatric opinion [4]—for in this case, appellant's own testimony was sufficient to permit the jury to find that he was likely to injure himself or others. Admission of the testimony of the psychiatrists, even if it was error, was not prejudicial because such testimony was along the same general line as testimony which was clearly not hearsay. Manley v. Northumberland County, 32 F.Supp. 775, 782 (M.D.Pa.1940); *see* United States v. Crescent Amusement Co., 323 U.S. 173, 184, 65 S.Ct. 254, 89 L.Ed. 160 (1944); Endy v. Baltimore & Ohio R.R., 73 A.2d 514, 516 (D.C.Mun.App.1950); *cf.* Swift v. United States, 314 F.2d 860, 863 (10th Cir. 1963); Wheeler v. United States, 82 U.S.App.D.C. 363, 365–366, 165 F.2d 225, 227–228 (1947), cert. denied, 333 U.S. 829, 68 S.Ct. 448, 92 L. Ed. 1115 (1948).

■■ Appellant's contention that the testimony of a person who is mentally ill —in this case, himself—is so inherently unreliable that no conclusions can be drawn from it is without merit. In essence, the argument amounts to an assertion that appellant was incompetent to testify concerning the details of the incidents in question. In the first place, however, appellant voluntarily took the stand to testify at the request of his counsel. He was examined and cross examined by counsel and the court without a single objection being made by either side to his testimony. That appellant objects to such testimony now is thus contrary to the position he took at trial. *See* Henderson v. United States, 218 F. 2d 14, 17–18 (6th Cir.), cert. denied, 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253 (1955). Moreover, a mentally ill person may be a competent witness. His competency to testify is to be determined by the court and the weight of his testimony by a jury. District of Columbia v. Armes, 107 U.S. 519, 2 S.Ct. 840, 27 L. Ed. 618 (1883); Lockard v. Parker, 164 F.2d 804, 806 (4th Cir. 1947); *see* Carter v. United States, 332 F.2d 728 (8th Cir.), cert. denied, 379 U.S. 841, 85 S.Ct. 79, 13 L.Ed.2d 47 (1964). *See generally* R. Allen, E. Ferster & H. Weihofen, Mental Impairment and Legal Incompetency 256–257, 327–343 (1968).[5] Here

---

3. Concerning one such incident of "self-defense," appellant testified as follows:

   I threatened two tram drivers. The story got a little confused. * * * I was at the [Washington] Monument Grounds and there is a little Information Booth where the young lady sits and I was talking with one of those young ladies there and the tram pulled up and there were some insults thrown out by the two tram drivers and an argument ensued and they said they would throw me off the Monument Grounds. And both were big men and they said, what do you want to do about it, and I said, I will be back. If there was going to be a fight I wasn't going to fight those two big men and I did come back and threaten if they wanted to fight I would give them a fight.

4. *Compare* Brown v. United States, 126 U. S.App.D.C. 134, 142, 375 F.2d 310, 318

(1966), cert. denied, 388 U.S. 915, 87 S. Ct. 2133, 18 L.Ed.2d 1359 (1967); Jenkins v. United States, 113 U.S.App.D.C. 300, 304, 307 F.2d 637, 641 (1962) *with* In re Gault, 387 U.S. 1, 56, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1966); Millard v. Harris, 132 U.S.App.D.C. 146, 155, 406 F.2d 964, 973 (1968).

5. At early common law "insane" persons and "idiots" were summarily disqualified from testifying. Today, only persons whose capacity to observe, recollect or communicate is so impaired as to render their testimony valueless are excluded; although the court may admit evidence of mental impairment as bearing on the credibility of a witness or the weight to be given his testimony.
   R. Allen, E. Ferster & H. Weihofen, Mental Impairment and Legal Incompetency, *supra*, at 327.

appellant's testimony was responsive to the questions of court and counsel, evinced a capacity to observe and full knowledge of the events in relation to which he testified. There is no reason to doubt either that he was a qualified witness as to the events concerning which he was interrogated, or that the jury could properly consider his testimony in reaching its conclusion.

Affirmed.