UNITED STATES of America
v.
Hilton BENN, Jr., Appellant.

UNITED STATES of America
v.
James W. HUNT, Appellant.
Nos. 71–1501, 71–1547.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 5, 1972.

Decided Dec. 1, 1972.

As Amended March 8, 1973.

Rehearing Denied March 19, 1973.

Mr. H. Stewart Dunn, Jr., Washington, D. C. (appointed by this Court), for appellant in No. 71–1501.

Mr. Julian H. Singman, Washington, D. C. (appointed by this Court), for appellant in No. 71–1547.

Mr. Harry J. McCarthy, Asst. U. S. Atty., with whom Messrs. Harold H. Titus, Jr., U. S. Atty., John A. Terry, and John G. Gill, Jr., Asst. U. S. Attys., were on the brief, for appellee. Mr. Thomas A. Flannery, U. S. Atty. at the time the record was filed, also entered an appearance for appellee.

Before BAZELON, Chief Judge, Justice CLARK,* of the Supreme Court of the United States and WILKEY, Circuit Judge.

BAZELON, Chief Judge:

Appellants were indicted for rape while armed,[1] rape,[2] and assault with a dangerous weapon.[3] The court dismissed the rape charges and appellants were convicted of assault with intent to commit rape while armed[4] and assault with a dangerous weapon. Appellant Hunt was also convicted on charges of carrying a dangerous weapon.[5] The issues are: (1) whether the trial judge erred in failing to order a psychiatric examination of the mentally retarded prosecutrix for the purpose of the court's determination of competency or to aid the jury in assessing the credibility of her testimony; (2) whether, in any case, the judge erred in determining that the prosecutrix was a competent witness as a matter of law; and (3) whether appellants were properly convicted on charges of assault with intent to commit rape while armed and assault with a dangerous weapon, arising from the same transaction.

I.

Appellants were arrested in a blind alley by police officers responding to a report that a woman in the alley was screaming for help. At trial, the neighbor who had reported the incident testified that, having been awakened by screams, she saw two men leading a young woman into the alley. After calling and directing police to the alley, she saw two men, dressed similarly to those she had seen earlier, being taken from the scene by the police.[6]

The arresting officers testified that when they entered the alley, appellants were crouched over a nude girl, but upon seeing policemen they straightened up and walked away from her. The victim was described as appearing frightened and nervous and having a bruise over her eye, scratches and handmarks on her neck, and dirt in her hair. She told the officers that both appellants had raped her and that Hunt had struck her on the head with a gun. The police recovered a switchblade knife from appellant Benn and a revolver was found next to one of the victim's discarded shoes. Other items of her clothing as well as her purse and its contents were scattered about the alley.

The prosecution's primary witness, the complainant, is a mentally retarded girl of 18. In order to determine her competency, the trial judge held a hearing out of the presence of the jury at which the girl's father testified that her memory was at times inconsistent and admitted that she did fantasize but that her flights of fancy were always innocuous and she never totally fabricated anything. She is usually able to accurately describe what she has observed and would be likely to retain an impression of a traumatic event, he claimed. On *voir dire* examination, the prosecutrix expressed an understanding of the meaning of an oath and related a comprehensible narrative of the events surrounding the crime. The judge reserved final ruling on the girl's testimony pending an evaluation of the degree of corroborative evidence produced, holding only that she had the "rudimentary

---

* Sitting by designation pursuant to Title 28, U.S.C. § 294(a).

1. 22 D.C.Code ¶¶ 2801, 3202.

2. 22 D.C.Code ¶ 2801.

3. 22 D.C.Code ¶ 502.

4. 22 D.C.Code ¶¶ 501, 3202.

5. 22 D.C.Code ¶ 3204.

6. She was unable, however, to make any facial identifications. Tr. 60.

**1130**

qualifications to tell what she recalls." (Tr. 90–1). At trial, the prosecutrix testified that she had been seized by the appellants and dragged screaming into the alley. They removed her clothes and assaulted her. Hunt hit her in the face with a gun; Benn threatened her with a knife and tried to choke her. In attempting to explain what appellants had done to her, the complainant was unable to define rape but did graphically describe appellants' acts.[7] After hearing substantial evidence corroborating her testimony, the court found the complainant to be a competent witness. The jury was allowed to hear her testimony as well as evidence concerning her mental condition, albeit with a cautionary instruction.

Although the prosecutrix was examined by a physician on the night of the alleged rape, the doctor did not testify at trial.[8] Without medical or any other corroborative evidence of penetration, the trial judge dismissed the rape charges and submitted to the jury the lesser included offense of assault with intent to commit rape while armed.

## II.

The competency of the witness to testify before the jury is a threshold question of law committed to the trial court's discretion. It remains for the jury, of course, to assess the credibility of the witness and the weight to be given her testimony. Competency depends upon the witness' capacity to observe, remember, and narrate as well as an understanding of the duty to tell the truth.[9] It also requires an assessment of the potential prejudicial effects of allowing the jury to hear the testimony. Mental retardation may be so severe, capabilities so impaired, and the testimony so potentially prejudicial that it should be barred completely by the judge. Or there may be sufficient indications of a witness' capacity and of the reliability of her testimony that it should be heard and assessed by the jury, albeit with a cautionary instruction.[10]

A mentally defective rape prosecutrix presents a particularly difficult problem for both judge and jury. It is generally agreed that sexual assault charges by mentally abnormal girls should be subjected to great scrutiny. There is real danger of contrivance or imagination—the events may seem real to the girl even though they exist only in her own mind. Yet that testimony may arouse enough sympathy to make an innocent man the real victim.[11]

To assist the court in making its competency decision, to aid the jury in assessing credibility, or to serve both purposes, the trial judge may order a psychiatric examination to obtain expert testimony concerning the degree and effect of a witness' disability.[12] Wigmore

7. The witness said that "Both of them stuck their privates in me . . . between my legs." Tr. 191.

8. The physician's failure to testify is discussed later in this opinion. See Tr. 227–28.

9. Doran v. United States, 92 U.S.App.D.C. 305, 306, 205 F.2d 717, 718, cert. denied, 346 U.S. 828, 74 S.Ct. 49, 98 L.Ed. 352 (1953).

10. District of Columbia v. Armes, 107 U.S. 519, 521–522, 2 S.Ct. 840, 27 L.Ed. 618 (1882); In re Penn, 143 U.S.App. D.C. 248, 251–252, 443 F.2d 663, 666–667 (1970).

11. Watson, Psychiatry for Lawyers at 95 (1968); Weihofen, Testimonial Competence and Credibility, 34 Geo.Wash.L.

Rev. 53, 74 (1965); see e. g. Overholser, The Psychiatrist and the Law 53–54 (1953); 3 Wigmore, Evidence 924(a) (3d ed. 1940).

12. The basis for ordering such examinations stems from the trial court's inherent power to conduct those inquiries necessary to a full and fair adjudication. State v. Butler, 27 N.J. 560, 143 A.2d 530 (1958); see United States v. Klein, D.C.D.C., 271 F.Supp. 506 (1967); aff'd sub nom, Hamilton v. United States, 139 U.S.App.D.C. 368, 433 F.2d 526 (1970); Ballard v. Superior Court, 64 Cal.2d 159, 49 Cal.Rptr. 302, 410 P.2d 838 (1966).

Although the trial counsel's passing reference to "scientific evidence or medical evidence" (Tr. 38–39) does not constitute a motion for the court-ordered

has suggested that the danger of false accusations and the potential for prejudicial impact is so severe in sexual assault cases that every sex offense complainant should be examined.[13] We think, however, that any such rigid rule is precluded by countervailing considerations. For example, a psychiatric examination may seriously impinge on a witness' right to privacy; the trauma that attends the role of complainant to sex offense charges is sharply increased by the indignity of a psychiatric examination; the examination itself could serve as a tool of harassment; and the impact of all these considerations may well deter the victim of such a crime from lodging any complaint at all. Since there is no exact measure for weighing these kinds of dangers against the need for an examination, the decision must be entrusted to the sound discretion of the trial judge in light of the particular facts.[14]

▆ In the present case the trial court found that the prosecutrix demonstrated an understanding of her duty to tell the truth and a capability to observe and remember.[15] A comprehensible narrative does emerge from the sum of her testimony. Also, as the cautious trial judge noted before allowing the witness to testify, there was substantial corroboration to her testimony giving extrinsic assurance of its reliability. Finally, the judge had the benefit of the girl's father's testimony as to her retardation

to assist him. Accordingly, the trial judge's determination of the prosecutrix's competency, without a psychiatric examination, will not be disturbed.

▆ The dangers which must be considered in determining whether a mentally retarded rape prosecutrix is a competent witness must also be considered by the jury in assessing her credibility,[16] particularly since "the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence. . . ."[17] The jury may be aided in its task by the results of a psychiatric examination, even when such an examination is not necessary to the judge's determination of competency. When an examination should be ordered to aid the jury is also a judgment, involving a balancing of need against dangers, which is committed to the discretion of the trial judge.[18] Here, the strong indications of reliability of the prosecutrix's testimony weigh heavily against the need for an examination. Also, the jury was not left to make its credibility decision without information as to the witness' defect; it had the frank and comprehensive testimony of the girl's father to assist it. In these circumstances, we cannot say that the trial judge erred in failing to order a psychiatric examination of the witness to aid the jury.

### III.

▆ The applicable rule for determining whether there has been a merger

---

examination of the witness, such a motion was unnecessary since the court may *sua sponte* call its own expert witnesses. Fed. R.Crim.P. 28(a).

13. 3 Wigmore, Evidence 924(a) (3d ed. 1940); *accord* ABA Committee on Improvement of the Law of Evidence, Report (1937–38); Guttmacher, Psychiatric Evaluation of Offenders, 2 Bull. World Health Org. 243 (1950).

14. Wilson v. United States, 106 U.S.App. D.C. 226, 227, 271 F.2d 492, 493 (1959) (rejecting the Wigmore proposal).

15. After conducting an examination of the prosecutrix and hearing testimony from her father out of the presence of the jury, the judge found that she had the

"rudimentary qualifications to tell what she recalls"; she was clearly in a position to observe and seems to have recalled with some clarity the events which were the subject of her testimony.

16. *See* Proposed Rules of Evidence, Notes to ¶ 6–01, 46 F.R.D. 285 (1969).

17. Napue v. Ill., 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); *cf.* Giles v. Md., 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967).

18. People v. Russel, 69 Cal.2d 187, 193–195, 70 Cal.Rptr. 210, 216–218, 443 P.2d 794, 800–801, cert. denied, 393 U.S. 864, 89 S.Ct. 145, 21 L.Ed.2d 132 (1968). *But cf.* State v. Falcetano, 107 N.J.Super. 375, 258 A.2d 391 (1969).

of two charges arising from the same act or transaction was set out in Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932):[19]

> . . . [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.

The elements of assault with intent to commit rape while armed are: 1) an assault, 2) with an intent to have intercourse and to achieve penetration against the victim's will, using such force or threat of force as is necessary to overcome her resistance,[20] 3) while "armed with . . . any pistol . . . or other dangerous or deadly weapon."[21] The proof of these elements would also be proof of the elements of the charge of assault with a dangerous weapon: 1) an assault, 2) with a criminal intent, albeit a more general one, and 3) with a dangerous weapon.[22] The assault with a dangerous weapon count therefore merges with and becomes a lesser included offense to the charge of assault with intent to commit rape while armed, barring the conviction on the lesser offense.[23] Accordingly, the convictions rendered under 22 D.C.Code § 502 are vacated and appellants' other convictions are affirmed.[24]

## IV

The writer of this opinion, speaking for himself, believes that another matter deserves comment. Although appellants do not raise the issue, the record before us suggests the possibility that appellants have been denied their constitutional rights to the effective assistance of counsel. As indicated earlier, a physician at D.C. General, a municipal hos-

---

19. *See, e. g.*, Gore v. United States, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958).

20. United States v. Bryant, 137 U.S.App. D.C. 124, 133, 420 F.2d 1327, 1336 (1969) ; Allison v. United States, 133 U.S.App.D.C. 159, 163, 409 F.2d 445, 449 (1969).

21. 22 D.C.Code ¶ 3202.

22. *See* United States v. Hill, 152 U.S.App. D.C. 213, 470 F.2d 361 (1972) (assault with a dangerous weapon conviction vacated when appellant also convicted of assault with intent to kill while armed as a result of the same event) ; United States v. Bryant, 137 U.S.App.D.C. 124, 132, 420 F.2d 1327, 1335 (1969) (assault is a lesser included offense to assault with intent to commit rape) ; *cf.* United States v. Hooper, 139 U.S.App.D.C. 171, 432 F. 2d 604 (1970).

23. *Compare* Ingram v. United States, 122 U.S.App.D.C. 334, 353 F.2d 872 (1965) *with* United States v. Hill, 152 U.S.App. D.C. 213, 470 F.2d 361 (1972). In *Ingram* this Court held that there was not a merger of charges of assault with a dangerous weapon and assault with intent to kill arising out of the same act. Since the former count requires proof of the use of a dangerous weapon and the latter proof of an intent to kill, "each provision requires proof of an additional fact which the other does not." Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1934). Thus separate convictions were permissible. We also held, however, that convictions on both counts would support concurrent but not consecutive sentences, because doubts as to whether Congress meant to pyramid punishments should be resolved not only in favor of lenity but also consistent with a reasonable legislative intent. *But cf.* 23 D.C.Code § 112 (Supp. V 1972).

In *Hill*, we held that convictions on charges of both assault with a dangerous weapon and assault with intent to kill while armed would result in the lesser charge being vacated even though, as here, concurrent sentences had been imposed.

24. We do not find it necessary to remand these cases to the District Court for resentencing on the greater offense. The cases in which we have followed such a procedure have involved convictions under the Federal Bank Robbery Act, 18 U.S.C. § 2113, hence been governed by Prince v. United States, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957). United States v. Parker, 143 U.S.App.D.C. 57, 442 F.2d 779 (1971) ; Bryant v. United States, 135 U.S.App.D.C. 138, 417 F.2d 555 (1969).

pital, examined the prosecutrix, at the instance of the police, shortly after the alleged assault. No one, however, called him to testify at appellants' trial. This apparently disturbed the conscientious and perceptive trial judge who inquired as to the physician's absence. The following disquieting colloquy ensued:

> THE COURT: . . . [T]he thing that concerns me is the fact that although corroboration in a circumstance like this is normally obtained by the testimony of a physician who examined the girl at the hospital. That physician has not been offered as a witness.
>
> Now, I take it from that no one of the three felt the testimony of that physician would strengthen his case. Of course, the Government has the burden of proof beyond a reasonable doubt on this issue as well as any other issue of fact in this type of case. I am wondering why the Government did not call the doctor.
>
> THE PROSECUTOR: May I tell you, your Honor?
>
> THE COURT: Why certainly.
>
> THE PROSECUTOR: I talked to the doctor on the phone. In fact, I subpoenaed him and he never showed up yesterday. He called and left his phone number where he could be reached. *There was a completely negative medical report, completely negative as to bruises and scratches, abrasions, lacerations around the face, negative in all respects,* completely negative as to any abnormality of mental health. I talked to the doctor on the phone and confronted him with the photographs [sic] I had told him I had photographs,[25] described the mental condition as I knew it of the defendant. He conceded to me he had absolutely no idea that night she was retarded. He told me his method of operation was to ask alleged rape victim what injuries she had and only then would he look at them. I combined this with the knowledge that has been public in the papers recently [sic] and other prosecutors that the doctors at D. C. General are giving negative medical reports of rape victims so they won't be called to court.
>
> THE COURT: Does your office have some responsibility?
>
> THE PROSECUTOR: Yes. Your Honor.
>
> THE COURT: Why don't you assume that responsibility?

Tr. 227–28.

Unfortunately, the record suggests more questions than it answers. We are left to speculate as to why counsel failed to elicit the examining physician's exculpatory testimony.[26] It is, of course,

---

25. My brothers speculate that photographs showing the "bruised and cut" condition of the victim's face could have "drastically embarrassed" the physician. Opinion of Judge Wilkey, *infra* at —— of 155 U.S. App.D.C., at 1136 of 476 F.2d. But the following colloquy indicates that there is a serious question as to what these photographs do show:

> THE PROSECUTOR: Directing your attention to Government's Exhibit No. 11 for identification, what, if any injuries did you—was intended to be shown?
>
> THE COURT: Doesn't the picture speak for itself?
>
> \* \* \* \* \*
>
> I am sure that is the rule . . . [as to laying the foundation for the introduction of photographs].
>
> \* \* \* \* \*
>
> The Court will ask whether the picture is a fair and accurate representation of what you saw?
>
> THE POLICE PHOTOGRAPHER: These pictures show partly what was taken and due to the condition of the camera, it didn't show fully exactly the darkness of the bruise, how it was, the size of the bruise, especially the one over her left eye.

Tr. 150.

26. The doctor would have reported not only that there was no indication of penetration but also that there were no signs of a struggle on the person of the victim. The prosecutrix testified that she had been struck in the face with a pistol by Hunt and choked by Benn. Police wit-

possible to construct a scenario in which that decision was a wise tactical choice. It is equally possible to conjecture that counsel failed to investigate the question of the physician's examination or were simply indifferent to the needs of their clients' cases. Which explanation comports with reality remains unknown.

I am well aware that there are dangers in attempting to second-guess the professional judgment of trial counsel. But to make the right to the effective assistance of counsel viable requires some assurance that counsel's trial decisions actually reflect an exercise of his professional judgment.[27] The question is not whether counsel would have done better by different choices, but only whether his trial decisions were informed, deliberate, and rational. In the circumstances of this case, I believe that the decision not to call the examining physician[28] demands some assurance that counsels' choice met this standard rather than reflecting counsels' ignorance or indifference.[29]

My brethren point out, however, that there may have been strategic reasons for defense counsel not calling the physician. As I understand it, their disposition rests on the view that they cannot find on the record before us in this case sufficient indication that the standard has not been met.[30]

nesses corroborated this story by describing a bruise over the victim's eye, allegedly a result of the pistol whipping, and scratch marks on her neck, as might have resulted from an attempted strangling. The physician's contrary testimony could conceivably have not only created a substantial doubt as to the truthfulness of the complainant, the prosecution's key witness, but also refuted the contention that there was an assault. There may, of course, be an assault without physical contact, but the prosecution in this case sought to prove a physical striking and resulting injuries.

Hunt was linked to the gun found at the scene primarily by the prosecutrix's testimony about his use of the weapon to strike her and the corroborating evidence of her facial injury. The physician's testimony as to the lack of any such mark might have been exculpatory as to this element of the prosecution's case as well.

27. *See* United States v. Mitchell, 104 U.S. App.D.C. 57, 65–66, 259 F.2d 787, 795–796 (1958) (Judge Fahy dissenting) (the court cannot bar inquiry into counsel's exercise of his professional judgment and yet protect the client's constitutional right); State v. White, 5 Wash.App. 283, 487 P.2d 243, 246 (1971) (in examining the acceptable boundaries of the exercise of judgment by counsel, the court could find ineffectiveness if counsel's choice of trial tactics was not deliberate, no reasonable lawyer would have so acted, or the decision was a result of ignorance of the law or inadequate preparation).

28. Since, as my colleagues recognize, the charge of rape was never a threat, the defense had nothing to lose and everything to gain by directing all their efforts to the single purpose of securing an acquittal on the lesser included offenses.

29. My brothers observe that the defense counsel "are not novices at defending criminal cases." Opinion of Judge Wilkey, *infra*, at —— of 155 U.S.App.D.C. at 1137 of 476 F.2d. But counsels' experience is hardly proof of effectiveness. The issue is what they did in *this* case.

And I find little else in the record of this case that is reassuring as to counsels' effectiveness. When asked how long he needed for his summation, one of the defense attorneys engaged in the following exchange with the court:

THE COURT: I will give you—

COUNSEL: I would like to move my car before 5:00.

THE COURT: I will allow ten minutes for each defendant unless you want more.

COUNSEL: No, I think that enough.

THE COURT: If you want it, you may have it.

COUNSEL: I think I will be stretching it in ten minutes. . . .

I hope the Court of Appeals doesn't look upon the summation as a *Hammond* situation. . . . I have enough trouble with the Court of Appeals that I was hollering and I gave a *Hammond* argument.

THE COURT: I am not asking you to talk for a half an hour, . . . .

Tr. 236–7

When counsel finally gave his argument, it was little more than *pro forma*.

30. Opinion of Judge Wilkey, *infra*, at 16–18.

The Court of Appeals for the Third Circuit [31] recently dealt with an ineffectiveness claim arising out of the unexplained failure of either defense or the prosecution to present a medical report of the examination of the prosecutrix of a rape charge. Admitting that "there may indeed be various reasons why it was not offered," the court refused to be lured into the quagmire of constructing after-the-fact explanations to rationalize counsel's conduct. The court remanded the case because such surmise "cannot take the place of proof."

Evidence of the inadequacy of trial counsel will often be outside the trial record [32]—in some cases precisely because counsel has been ineffective. For example, when counsel has failed to conduct an investigation, the record may be barren of mention of the witnesses he would have called [33] or defenses he would have raised [34] had he done so. It may be that only the inquiry of the attentive trial judge will bring to light the question of effectiveness of counsel.[35] But, in such circumstances, appellant may ventilate a claim of ineffectiveness without being relegated to collateral attack. A meritorious ineffectiveness claim is available on a motion for a new trial.[36] The claim may be supported by evidence *dehors* the record without a showing of due diligence.[37]

Accordingly, I would affirm appellants' convictions (except those rendered under 22 D.C.Code § 502).

## V

Nor is the effectiveness of defense counsel the only problem that concerns me in this matter. The court today acknowledges that the charge of rape could not be sustained without the testimony

---

31. United States ex rel. Kent v. Maroney, 435 F.2d 1020 (3d Cir. 1970).

32. Brubaker v. Dickson, 310 F.2d 30 (9th Cir. 1962). *See also*, United States v. Washington, 154 U.S.App.D.C. ——, 475 F.2d 357 (1973).

33. *See, e. g.*, United States v. Thompson, 154 U.S.App.D.C. ——, 475 F.2d 931 (1973) ; United States v. Moore, 432 F.2d 730, 739 (3d Cir. 1970) ; Tucker v. United States, 235 F.2d 238 (9th Cir., 1956).

34. People v. Ibarra, 60 Cal.2d 460, 34 Cal. Rptr. 863, 386 P.2d 487 (1963) (Justice Traynor, writing for the court, found counsel had been ineffective where he failed to move for the suppression of evidence due to a misapprehension of the applicable law) ; *see*, Plummer v. United States, 104 U.S.App.D.C. 211, 260 F.2d 729 (1958) (Judge Bazelon dissenting) (the dissent would have remanded the case for a hearing as to the reason for an unexplained failure to assert an insanity defense).

35. In United States v. Simpson, 154 U.S. App.D.C. ——, 475 F.2d 934 (1973) (Bazelon, Chief Judge, dissenting), the dissent suggested a mechanical device, a preparation report to be submitted by counsel before his client pleads or at the close of trial after the verdict had been rendered, to provide the trial and appellate courts with information about counsel's effectiveness. *See Id.* at ——, 475 F.2d at 940 and Appendix.

36. United States v. Benjamin Thompson, 154 U.S.App.D.C. ——, 475 F.2d 931 (1973) ; United States v. Smallwood, 153 U.S.App.D.C. 387 at 392, 473 F.2d 98 (1972) at 103 (Bazelon, Chief Judge concurring) ; *see* Fed.R.Crim.P. 33 ; Marshall v. United States, 141 U.S.App. D.C. 1, 5 n. 11, 436 F.2d 155, 159, n. 11 (1970). The judgment as to whether there is a meritorious claim warranting such a motion should be made by appellate counsel on the basis of an investigation rather than by this court on the basis of pure speculation.

37. The pendency of an appeal does not inhibit the filing of a motion for a new trial, thus limiting its usefulness to appellate counsel. Fed.R.Crim.P. 33 states, ". . . if an appeal is pending the court may grant the motion only on remand of the case." It is, however, settled law in criminal cases that the motion can be made without a remand and, if the district court indicates that it will grant the motion, then a motion for remand is made in the appellate court. Thus, when counsel on appeal finds an ineffectiveness issue as to which there is an inadequate record, he should file a motion for a new trial in the district court before the appeal is heard in this court. *See* Smith v. Pollin, 90 U.S.App.D.C. 178, 179, 194 F. 2d 349, 350 (1952).

of the examining physician. Plainly, the prosecutor intended neither to call the doctor nor to move for dismissal of the rape charges. It would therefore appear that the prosecution was prepared to gain a conviction without evidence it knew to be essential.

In addition, as the colloquy described above shows, the prosecutor advised the court that ". . . the doctors at D. C. General [are] giving negative medical reports [on] rape victims so they won't be called to court." Every citizen has an obligation to come forward with evidence crucial to a criminal prosecution. According to government counsel, there was not only a disregard for that duty, but also an unjustifiable circumvention of legal and professional responsibilities by doctors on the staff of a public hospital. This situation demands an immediate, careful, and impartial inquiry by a representative of the Department of Justice into what action has been taken to insure that the offending doctors, their supervisors, and those city officials charged with the administration of the hospital properly fulfill their responsibilities.

WILKEY, Circuit Judge, with whom concurs Mr. Justice CLARK.

 We concur in Parts I, II and III of Judge Bazelon's opinion which speaks for the unanimous court. We disagree with Parts IV and V in which Judge Bazelon suggests that a new trial might be appropriate in this case due to the alleged inadequacy of trial counsel. Since our view of the point raised differs from that expressed by Judge Bazelon, we feel obligated to say why.

Judge Bazelon's concern arises from the failure of the physician who examined the rape victim to appear. "The conscientious and perceptive trial judge" inquired as to the physician's absence and commented:

Now, I take it from that no one of the three felt the testimony of that physician would strengthen his case. Of course, the Government has the bur-

den of proof beyond a reasonable doubt on this issue as well as any other issue of fact in this type of case. We suggest that those two sentences of Judge Gasch should have assuaged all of our dissenting colleague's fears. The Government does bear the burden of proof beyond a reasonable doubt. Without the testimony of a physician, it is much more difficult than otherwise to prove a charge of rape, and the trial court here recognized that by dismissing the original charges of rape while armed and simple rape. The appellants were convicted of assault with intent to commit rape while armed, a lesser included offense, which may very well have been required because of the absence of the medical testimony.

When Judge Bazelon says "we are left to speculate as to why, counsel failed to elicit the examining physician's exculpatory testimony," he not only ignores Judge Gasch's statement, he does not give sufficient credit to the astuteness of defense counsel. Without any medical testimony in the record, each defense counsel knew he was highly likely to get his client off on the serious charges of rape while armed or simple rape, and this did occur. Both defense counsel were informed of the physician's negative written report after examination of the victim. Each confronted the probability that if he introduced the report, it would be followed by the Government's putting the doctor himself on the stand. Defense counsel had heard the colloquy between the prosecutor and the court, to the effect that the prosecutor "talked to the doctor on the phone and confronted him with the photographs [sic] I had told him I had photographs, described the mental condition as I knew it of the defendant. He conceded to me he had absolutely no idea that night she was retarded."

If the defense had offered either the physician's negative report or the physician himself, the physician would have been drastically embarrassed by photographs showing the bruised and cut condition of the face of the victim in con-

trast to his own completely negative report as to bruises, scratches, etc. The jury might have believed the doctor in contrast to a police officer witness, if that were all the prosecution had to offer, but the photographs would have forced the doctor into admitting in front of the jury what he had told the prosecutor.

> He conceded to me he had absolutely no idea that night she was retarded. He told me his method of operation was to ask alleged rape victim what injuries she had and only then would he look at them. I combined this with the knowledge that has been public in the papers recently [sic] and other prosecutors that the doctors at D.C. General or [sic] giving negative medical reports of rape victims so they won't be called to court.

The physician's negative report on indicia of rape itself would thus likewise have been impeached, and who knows that the doctor would then have said? Certainly defense counsel did not.

Given this situation as to the physician's possible testimony, both defense counsel made a calculated trial tactical judgment and did not offer either the physician's report or the physician in person. It is not for this Court to say whether a witness who was never called would be convincing or not—to do so would not only infringe on defense counsel's and the jury's role but would also amount to little more than idle speculation. The doctor's testimony was definitely a double-edged sword. The defense counsels' tactics paid off by securing the dismissal of the rape while armed and the rape charges; a different tactic may have made sure of the conviction of the defendants for rape while armed, a much more serious offense.

It is obvious that the trial judge, one of the most experienced in the courtroom of any on our District bench, thoroughly understood the situation in regard to the trial strategy of the prosecutor and the two defense counsel, made inquiry of it, saw that the defense was fully informed of all the facts, and very properly left it up to two experienced counsel as to what in the best interest of their clients they desired to do about it.

In light of the colloquy between bench and counsel, in light of the complete revelation by the prosecution to the defense not only of the physician's report but also of his comments in the telephone conversation, we cannot understand Judge Bazelon's intimation that counsel's "trial decisions were [not] informed, deliberate and rational." How could counsel have been better informed? What now will be gained by a remand to the trial court—except the prolongation of the time before these defendants embark upon the punishment a judge and jury have found they deserve?

We have noted that the two defense counsel have been admitted to the bar for 16 and 8 years, respectively, and judging from this record are not novices at defending criminal cases. We have examined their closing arguments and, while neither would rank as a classic at the bar, the facts, issues, and *dramatis personae* of this case hardly called for the intellectual and forensic powers of a Webster or Darrow.

All convictions, except those rendered under 22 D.C.Code § 502, are

Affirmed.