GOVERNMENT OF the VIRGIN ISLANDS

v.

Louis SCUITO, Appellant.

No. 79–1905.

United States Court of Appeals, Third Circuit.

Argued April 23, 1980.

Decided June 25, 1980.

Larry J. Ritchie, Washington, D.C. (argued), John E. Stout, Grunert, Stout, Hymes, Mayer & Smock, Charlotte Amalie, St. Thomas, V.I., for appellant.

David B. Smith (argued), Dept. of Justice, Washington, D.C., Ishmael A. Meyers, U.S. Atty., Terry M. Halpern, Asst. U.S. Atty., Charlotte Amalie, St. Thomas, V.I., for appellee.

Before ADAMS, MARIS and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

In this appeal from a conviction for forcible rape,[1] the defendant Louis Scuito asserts two errors: (1) The trial judge erred in not barring a new trial on double jeopardy grounds after a mistrial was declared on Scuito's motion because of certain prejudicial questions asked by the prosecutor. (2) The trial judge abused or failed to exercise his discretion in denying the defendant's motion for a psychiatric examination of the complainant. Finding neither ground persuasive, we will affirm the conviction.

### I.

The complainant worked as a waitress at the Drunken Shrimp restaurant, where the defendant was a frequent patron. When the complainant worked late on the night of July 9, 1978, the owner of the restaurant arranged for Scuito to give the complainant a ride to her apartment. It is undisputed that Scuito took a detour down a beach road, where the two had sexual intercourse, after which he took the complainant home. The crucial issue at trial was solely whether she consented.

According to the complainant, Scuito turned down the beach road to relieve himself, and then continued to a turnaround, stopped the jeep, and began kissing her. She expressed lack of interest, but the defendant then told her he had a knife and would throw her into the ocean if she did not cooperate. She testified that she did not actually see the knife in the dark, but felt "something metal" cut into her neck, after which she ceased resistance and attempted to calm him and avoid harm by

cooperating. At trial there was medical and other testimony of a cut on the side of the complainant's neck where she said the knife was held. After taking off her clothes, the defendant raped and sodomized her. During the course of the assault she prayed and recited her "mantra."[2] Upon being dropped off at home, she kissed the defendant on the forehead because, she testified, "I was praying for him" and "it was just kind of like an end to the prayer."

Scuito testified that he casually knew the complainant and her sister and had previously driven them home from the restaurant. He said that on the night of July 9, when he gave the complainant a ride to her apartment, she seemed "a little spaced, not all there." While riding home, she offered him marijuana and he drove off the main road to smoke it with her. He later "came on to her," he said. Although initially she protested, he eventually changed her mind without using or threatening any physical force.

Prior to the first trial there had been a discussion between counsel and the court regarding the admissibility of evidence that Scuito previously had raped another young woman after threatening to shoot her with a flare gun. Defense counsel contended that such evidence would be relevant only if the defendant put his character in issue, which he did not at that time intend to do. The prosecutor agreed not to mention the other alleged rape in the opening statement to the jury, but reserved the right to seek admission of the evidence under Fed.R. Evid. 404(b),[3] if the testimony that was adduced created the opportunity. The trial judge asserted that the evidence could be

1. The defendant was convicted under V.I. Code Ann., tit. 14, § 1701(3).

2. A mantra has been defined as ["a] sound aid used while meditating. Each meditator has his own personal mantra which is never to be revealed to any other person." *Malnak v. Yogi*, 592 F.2d 197, 198 (3d Cir. 1979). When asked on cross-examination what a "mantra" is, the complainant stated:

It's something that you do to put yourself (sic) rather than worrying about all the other things that are going on outside of your

own self you try to center your consciousness and like bring it to a good state of mind.

3. That rule states:

1. Evidence of other crimes, wrongs, or acts, is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

admissible only if he became satisfied that it was relevant and met the Fed.R.Evid. 403 standard of probative value outweighing prejudice to the defendant. "For that purpose," he said, "I will hear testimony to be offered outside of the presence of the jury and make that determination."

The defense called two witnesses at the first trial: the defendant himself and a next-door neighbor who was defendant's former roommate. The latter answered "no" to defense counsel's question whether he knew anything about the defendant that would indicate any abnormal sexual behavior on his part. Prior to cross-examining the former roommate, the prosecutor asked for "a ruling with respect to my specific question," to which the court replied, "Well, ask the question, I don't give any rulings in advance." The prosecutor thereafter asked the witness whether he would consider rape to be abnormal sexual behavior. The next question, "Would your consider a man that took a flare gun—," was interrupted by defense counsel's objection that the prosecutor "was getting into the same line we were discussing previously."

Asked if the question was a hypothetical one, "not related to the facts," the prosecutor replied: "It is not related to the facts of this case." The objection was overruled and the prosecutor asked: "Would you consider a man taking a flare gun, holding it at a woman and telling her he will disfigure her if she didn't allow him to have intercourse with her, would you consider that to be abnormal, aberrant sexual behavior?" After an affirmative reply, the prosecutor asked, "If you had heard—," only to be cut off by the court disallowing the question and indicating that it "goes to something that has not been put in issue." Shortly thereafter, when the defense rested and the jury was excused, defense counsel moved for a mistrial on the basis of the question about the flare gun.

The trial judge granted a mistrial, and said he based his decision on three incidents in the trial. First, when the owner of the Drunken Shrimp testified, she made two spontaneous outbursts indicating her belief that Scuito was guilty.[4] Second, the complainant had put the defendant's character in issue by suggesting he had had homosexual relationships. Third was the reference to the flare gun.

In motions preceding the second trial, the defendant asked that the indictment be dismissed on double jeopardy grounds, or, if it were not, for an order requiring a psychiatric examination of the complainant "and further providing that the results of [the] examination be made available to the defense for possible use at trial." Both motions were denied and, after a trial with essentially the same evidence as in the first, but without the prejudicial incidents noted by the judge, Scuito was convicted.

## II.

The double jeopardy clause of the Fifth Amendment protects a defendant in a criminal proceeding against repeated prosecutions for the same offense as well as against multiple punishments. Underlying the safeguard is the belief that the state should not be allowed to make repeated attempts to convict an individual. *United States v. Dinitz*, 424 U.S. 600, 606, 96 S.Ct. 1075, 1079, 47 L.Ed.2d 267 (1976). The reach of the clause's bar to successive prosecutions may extend to terminations of trials by mistrials as well as by acquittals. Because the accused has a "valued right . . . to have his trial completed by the particular tribunal summoned to sit in judgment on him," *Downum v. United States*, 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100 (1963), a mistrial on the prosecution's motion or by the court on its own initiative should be declared only when there is "manifest necessity" for it. *United States v. Perez*, 9 Wheat. 579, 580, 22 U.S. 256, 256, 6 L.Ed. 165 (1824).

4. At one point the witness, obviously distraught, had blurted out, "Louie, why did you do it." Later she said, "I have known Louie for one year, I can't believe [he] would do that."

Both times, the court admonished her not to volunteer such comments and instructed the jury to disregard them.

Different considerations have been held to apply to mistrials declared on a defendant's motion as opposed to those declared without the defendant's assent. Whereas the "manifest necessity" standard applies to the latter, with the former a retrial is barred only when the circumstances causing the mistrial are " 'attributable to prosecutorial or judicial overreaching.' " *United States v. Dinitz*, 424 U.S. 600, 607, 96 S.Ct. 1075, 1079, 47 L.Ed.2d 267 (1976) (quoting *United States v. Jorn*, 400 U.S. 470, 481, 91 S.Ct. 547, 555, 27 L.Ed.2d 543 (1971) ). Defendants are to be protected against " 'bad faith' conduct by judge or prosecutor," as when government actions are "intended to provoke mistrial requests." *Id.*, 424 U.S. at 611, 96 S.Ct. at 1081. Elsewhere the Supreme Court has stated: "Where the defendant, by requesting a mistrial, exercised his choice in favor of terminating the trial, the Double Jeopardy Clause generally would not stand in the way of reprosecution. Only if the underlying error was 'motivated by bad faith or

undertaken to harass or prejudice,' . . . would there be any barrier to retrial." *Lee v. United States*, 432 U.S. 23, 32–33, 97 S.Ct. 2141, 2147, 53 L.Ed.2d 80 (1977) (quoting *Downum*, 424 U.S. at 611, 96 S.Ct. at 1081).

Scuito argues that the trial judge erred in denying his motion to dismiss the indictment by applying the wrong legal standard to his double jeopardy claim. He contends that the court required a showing of "substantial prosecutorial misconduct," whereas "gross negligence" ought to be sufficient.[5] On the other hand, the Government urges us to restrict the double jeopardy bar to mistrials declared because of prosecutorial recklessness.[6]

The practical difference between "gross negligence" and "recklessness" is not always clear,[7] although both connote a more extreme departure from a reasonable standard of conduct than does "mere negligence," which is clearly insufficient to preclude reprosecution.[8]

---

**5.** The gross negligence standard for precluding retrial has been adopted by two courts of appeals. *See United States v. Crouch*, 566 F.2d 1311, 1318 n. 9 (5th Cir. 1978) ("We have held . . . that prosecutorial overreaching includes gross negligence."); *United States v. Kessler*, 530 F.2d 1246, 1256 (5th Cir. 1976) (same); *United States v. Beasley*, 479 F.2d 1124, 1126 (5th Cir.), *cert. denied*, 414 U.S. 924, 94 S.Ct. 252, 38 L.Ed.2d 158 (1973); *United States v. Martin*, 561 F.2d 135, 139–40 (8th Cir. 1977).

**6.** The standard the Government would have us adopt is stated thus: "[W]here a prosecutor engages in intentional misconduct which he or she knows has the potential for producing a mistrial and the court determines that the prosecutor was either indifferent to such an outcome or had reason to seek it, the Double Jeopardy Clause bars a retrial." Brief for Appellee at 20; *see id.* at 22 (retrial should not be barred unless there is good reason to believe that the court or prosecutor was "indifferent" to possibility of mistrial).

**7.** Dean Prosser describes gross negligence as follows:

As it originally appeared, this was very great negligence, or the want of even scant care. It has been described as a failure to exercise even that care which a careless person would use. Several courts, however, dissatisfied with a term so nebulous, and struggling to

assign some more or less definite point of reference to it, have construed gross negligence as requiring willful misconduct, or recklessness, or such utter lack of all care as will be evidence of either—sometimes on the ground that this must necessarily have been the intent of the legislature. But it is still true that most courts consider that "gross negligence" falls short of a reckless disregard of consequences, and differs from ordinary negligence only in degree, and not in kind. There is, in short, no generally accepted meaning; but the probability is, when the phrase is used, that it signifies more than ordinary inadvertence or inattention, but less than conscious indifference to consequences; and that it is, in other words, merely an extreme departure from the ordinary standard of care.

W. Prosser, *Handbook of the Law of Torts* § 34, at 183–84 (4th ed. 1971) (footnotes omitted). The Model Penal Code distinguishes between acting recklessly and acting negligently according to whether a person "consciously disregarded" or simply "should be aware of" a substantial and unjustifiable risk. Model Penal Code § 2.02, *reprinted in* 10 Uniform Laws Ann. at 465. No definition of gross negligence appears.

**8.** *United States v. DiSilvio*, 520 F.2d 247, 250 (3d Cir.), *cert. denied*, 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386 (1975); *see United States*

■ Assuming that either gross negligence or recklessness might constitute prosecutorial overreaching that would trigger the double jeopardy bar to retrial,[9] and assuming that a significantly lower level of egregiousness could be termed gross negligence but not recklessness,[10] we conclude that a retrial was nevertheless permissible in this case. The first two reasons given by the judge in declaring a mistrial concerned events not attributable to prosecutorial misconduct. The improper utterances of the restaurant owner were spontaneous and in no way elicited by the prosecutor. It is somewhat unclear whether the prosecution or defense first put the defendant's charac-

ter in issue,[11] but since defense counsel did not object we find it somewhat incongruous for him now to claim that any error in questioning as to character constituted gross negligence.

The only significant question, therefore, is how to describe the prosecutor's introduction of questions about the flare gun incident. The most accurate characterization, we believe, and the one seemingly put forth by the trial judge, is that the improper questioning was the result of a misunderstanding.[12]

It had been decided at pretrial discussions that the alleged other rape would not be

---

*v. Jorn*, 400 U.S. 470, 484, 91 S.Ct. 547, 556, 27 L.Ed.2d 543 (1970) (dictum). In *DiSilvio*, we suggested that prosecutorial misconduct must be "intentional," and not simply negligent, regardless of the level of the negligence, to bar retrial. *See* 520 F.2d at 250.

9. It is unclear why the Government conceded that recklessness was sufficient to bar reprosecution, rather than arguing from the Supreme Court cases that intentional, bad faith misconduct was required. In any event, we do not find it necessary in this case to choose among the proffered standards.

10. Intention as to result is irrelevant to both concepts. *See* note 6 *supra*. Rather, the distinguishing characteristic, to the extent one may be found, seems to be whether or not the indifference to a prescribed standard of conduct was conscious or intentional. *See id.*

11. In a colloquy on the mistrial motion between defense counsel and the court, the trial judge seemed to indicate that defense counsel, Mr. Stout, first put the defendant's character at issue:

> MR. STOUT: I was not the one that put this aspect of character in issue anyway. It was the questioning as I recall of Mrs. Halpern of Mr. Scuito about any homosexual relationship, about the possibility of it.
> THE COURT: You started [it] in a sense [when] you asked him did he live with anyone and he said yes and you asked him male or female.
> MR. STOUT: But that wasn't to show anything about homosexuality, that was to show that he was accustomed to living with a lady.
> THE COURT: Exactly, which is the negative of saying he is not [sic] a homosexual.
> MR. STOUT: Not for that purpose at all. It was strictly for the purpose [of showing] that he is not like some little old demented men walking around and doesn't have any source of sexual intercourse and I think it is clear

that this was the reason why that evidence was put in.
On the other hand, in giving his oral decision regarding the mistrial motion, the judge stated that the complainant was "the one that put this defendant's character in issue, not the defendant. She is the one as I recall the testimony who first suggested that there was some improper relationship between the defendant and [another man] whom she described as 'gay.'"

12. The characterization as a misunderstanding is apparent in the following explanation from the bench:

> Then came the question about the flare gun. It is true that counsel had asked to come to sidebar about a question and it is true that I declined to have counsel come to sidebar. I declined that several times when Mr. Stout wanted to come to sidebar also and I do that because in nine cases out of ten the sidebar conference is a waste of time.
> I see my function as sitting as a Judge and not as a professor of law and nine times out of ten it is to ask the Court a question that counsel should have researched and informed himself or herself of the answer before coming to court. That flare gun question did not need a sidebar conference as I see it because I had previously ruled that before we went into any aspect, and I ruled this before the trial began, before we went into any aspect of this extrinsic wrongful act of this defendant, I would hold a hearing outside of the presence of the jury and I would hear the testimony and I will decide its relevancy and I will decide the possible prejudice before the jury heard anything about it. And if that was all counsel desired there was no need to ask for a sidebar conference. The simple thing was to say I am ready for that hearing and it would have been accorded. But nobody asked for a hearing.

mentioned in the prosecutor's opening statement and that the prosecutor would request a hearing out of the presence of the jury if subsequent events led the government to believe the evidence was admissible. The prosecutor did not in fact mention the incident in her opening statement and believed she was complying with the pretrial decision when she asked for a sidebar conference. Thinking more routine matters were at stake, the judge instructed her to continue questioning and said that he would wait for an objection before making a ruling.

The trial judge ascribed no bad motives to the prosecutor's conduct and indeed, concluded that, at most, "misjudgment" rather than "misconduct" was involved.[13] Thus, whether the standard be gross negligence, recklessness, or misconduct of a more intentional nature, any prosecutorial error in conducting the first trial did not trigger the Fifth Amendment's bar to double jeopardy.

### III.

As an alternative to his double jeopardy claim, Scuito moved before the second trial for a psychiatric examination of the complainant. In a supporting affidavit, his attorney made the following specific representations:

I have been informed by any number of persons in the community that the said complainant appears to be often, if not almost constantly, in a "spaced out" or trancelike state; I have personally observed this; I have been further informed by persons in the community that the said complainant is addicted to, and does continually use, controlled substances, and that she is frequently in altered states of consciousness therefrom; and I have further observed and been told of the said complainant's habit of

dressing and being seen publically in see-through top garments which seem indicative of socially aberrant behavior;

Further, my observation of the said complainant at the first trial herein showed, in my opinion, a rather strange and mysterious countenance on her part, and her testimony appeared strange, not only from the standpoint of her account of not reporting the alleged crimes until the next day, but particularly from her admitted interest and devotion to a certain book, written by a guru devotee of Timothy Leary which contains passages of religious-like worship of LSD and other mind-altering drugs; [and]

That the foregoing observations are highly indicative of a personality which fantasizes to extremes and which indulges in and seeks altered states of consciousness[.]

The trial judge denied the motion because to require a psychiatric examination "would violate the spirit of [Fed.R.Evid.] 412." Scuito contends that any reliance on Rule 412 is legal error and that, by relying on the rule, the judge either abused his discretion or failed properly to exercise his discretion. It is apparent, though the defendant does not so state, that different consequences would flow from these alternative conclusions: if the judge abused his discretion to the prejudice of defendant, a new trial should be ordered; if he failed to exercise his discretion out of a mistaken belief that Rule 412 controlled the issue, we should remand so that he may consider the matter anew. We conclude that the court exercised its discretion and that it was not abused.

Defendant does not press the extreme position, espoused by Wigmore, that a psychiatric examination of a complainant should be required in all sexual offense prosecutions.[14] Rather, defendant agrees

---

**13.** In the opinion denying defendant's motion to dismiss the indictment before the second trial, the court stated:

The distinction must be made between misjudgment and misconduct. If anything the former may have been present in this case. Evidence as to the latter, if present, escaped

the Court's notice. Counsel on both sides it appears, committed trial error.

**14.** *See* 3A Wigmore on Evidence § 924a, at 737 (Chadbourne rev. 1970) ("No judge should let a sex offense charge go to the jury unless the female complainant's social history and mental

with the Government that the decision to order an examination is "entrusted to the sound discretion of the trial judge in light of the particular facts." *United States v. Benn*, 476 F.2d 1127, 1131 (D.C. Cir. 1972) (Bazelon, C. J.); *see Ballard v. Superior Court*, 64 Cal.2d 159, 49 Cal.Rptr. 302, 313, 410 P.2d 838, 849 (Cal.1966). *But cf. United States v. Dildy*, 39 F.R.D. 340, 342 (D.D.C. 1966) (courts have no power absent a statute to compel complainant to submit to psychiatric examination).

This discretion is not, of course, unbounded, for there are countervailing considerations weighing heavily against ordering a psychiatric examination of a complainant. As set out by the Court of Appeals for the District of Columbia Circuit, they are that

> a psychiatric examination may seriously impinge on a witness' right to privacy; the trauma that attends the role of complainant to sex offense charges is sharply increased by the indignity of a psychiatric examination; the examination itself could serve as a tool of harassment; and

the impact of all these considerations may well deter the victim of such a crime from lodging any complaint at all.

*United States v. Benn*, 476 F.2d at 1131. *Benn*, it should be noted, held that the trial judge did not abuse his discretion in declining to order the examination of an admittedly mentally defective complainant.[15]

Fed.R.Evid. 412 is specifically addressed to evidence of a rape victim's prior sexual conduct,[16] whereas defendant's motion was not an attempt to introduce such evidence, but an effort to obtain an expert opinion regarding the complainant's general ability to perceive reality and separate fact from fantasy. Because the rule does not directly apply to his motion, the defendant argues that the court either abused or did not exercise its discretion in denying the motion. The judge's ruling, however, was not based on the letter but on the spirit of Rule 412. The principal purpose of that rule is, as its legislative history demonstrates,[17] quite similar to the countervailing considerations quoted above: "to protect rape vic-

---

makeup have been examined and testified to by a qualified physician.") (italics deleted). The Wigmore position does not seem to be accepted in any jurisdiction. *See* Tanford & Bocchino, *Rape Victim Shield Laws and the Sixth Amendment,* 128 U.Pa.L.Rev. 544, 547 n. 11 (1980) (describing Wigmore's position as "untenable as a general rule").

**15.** The trial judge in *Benn* declined to order a psychiatric examination, observing that corroborating evidence was present. *See* 476 F.2d at 1131. The Supreme Court of California has stated that a necessity authorizing the court to order the complainant to undergo such an examination "would generally arise only if little or no corroboration supported the charge and if the defense raised the issue of the effect of the complaining witness' mental or emotional condition on her veracity." *Ballard v. Superior Court,* 64 Cal.2d 159, 49 Cal.Rptr. 302, 313, 410 P.2d 838, 849 (1966). In the case sub judice, a key element of the complainant's testimony was corroborated. She testified that the defendant held a knife to her throat, and the medical examiner reported a cut on the side of her throat where the weapon was held.

One scholar's examination of the problem led to the following recommendation:

> In the face of compelling circumstances (such as lack of corroboration and reason to doubt the witness' story), a judge could properly decide to take [the] drastic tack [of or-

dering a psychiatric examination]. If such an interview—or some other reliable source—yields conclusions supportive of the defense's theory [that the defendant is truly disturbed, distorts reality, or is a pathological liar], the accused should clearly be permitted to prove these highly relevant facts.

*Berger, Man's Trial. Woman's Tribulation: Rape Cases in the Courtroom,* 77 Colum.L.Rev. 1, 68–69 (1977) (footnotes omitted).

**16.** The principle portion of the Rule qualified in subsections (b)–(d), states:

> Notwithstanding any other provision of law, in a criminal case in which a person is accused of rape or of assault with intent to commit rape, reputation or opinion evidence of the past sexual behavior of an alleged victim of such rape or assault is not admissible.

**17.** There was no committee report on the Privacy Protection for Rape Victims Act of 1978, which added Rule 412 to the Federal Rules of Evidence. Comments on the floor of the House by Representatives Mann, Wiggins, and Holtzman are reported at 124 Cong.Rec. H 11944–45 (Oct. 10. 1978) and reprinted in 28 U.S.C.A. Fed.R.Evid. 412 note (Supp.1979). Comments in the Senate by Senators Thurmond, Bayh and Biden are reported at 124 Cong.Rec. S 18579–81 (Oct. 12, 1978).

tims from the degrading and embarrassing disclosure of intimate details about their private lives."[18] The rationale, according to one commentator, "is to prevent the victim, rather than the defendant, from being put on trial."[19]

We hold that in relying on the *spirit* of Rule 412 the trial judge exercised discretion, and that nothing alleged in defense counsel's affidavit indicates that he abused his discretion. To the extent admissible, and we express no opinion on that matter, evidence that the complainant was thought by members of the community to indulge in drugs leading to "altered states of consciousness" or to dress in a manner "indicative of socially aberrant behavior" could be introduced by direct rather than expert testimony. If, however, such matters are not relevant or otherwise admissible, there is no justification for letting them into the trial by allowing an expert to give his opinion regarding them. As to defense counsel's observations of the complainant at the first trial, we note that the trial judge as well had an opportunity to observe whether her manner or testimony was sufficiently indicative of mental disturbance to justify a psychiatric examination.

### III.

The judgment of the trial court will be affirmed.

---

18. 124 Cong.Rec. H 11945 (Oct. 10, 1978) (Rep. Mann).

19. 2 J. Weinstein & M. Berger, Weinstein's Evidence § 412[01], at 412–9 (1979). The rule may also be seen as part of a movement toward making rape prosecutions less special and treating the rape complainant like complainants in other crimes. *See* Berger, *supra* note 15, at 97.