**UNITED STATES of America,**
**Appellee,**

v.

**Alfred CATINO and Thomas Pagano,**
**Appellants.**

**No. 68, Docket 31991.**

United States Court of Appeals
Second Circuit.

Argued Oct. 9, 1968.

Decided Nov. 19, 1968.

1. Title 21 U.S.C. Sec. 174.

492

Joshua N. Koplovitz, New York City, for appellant Alfred Catino.

Henry K. Chapman, New York City, for appellant Thomas Pagano.

William J. Gilbreth, Asst. U. S. Atty., Southern District of New York (Robert M. Morgenthau, U. S. Atty., and Douglas S. Liebhafsky, Asst. U. S. Atty., Southern District of New York, on the brief), for appellee.

Before FRIENDLY, ANDERSON and FEINBERG, Circuit Judges.

ANDERSON, Circuit Judge:

The indictment in this case filed November 2, 1966 charged violations of the narcotics laws in two substantive and one conspiracy count. Count one alleged that Alfred Catino and Frank Fimmano received, concealed, sold and facilitated the concealment, transportation and sale of illegally imported heroin on June 13, 1966 in violation of 21 U.S.C. §§ 173 and 174. Count two charged Thomas Pagano and Frank Fimmano of a like offense on August 31, 1966. The third or conspiracy count charged all three of conspiring to commit the substantive offenses. Fimmano pleaded guilty, immediately prior to trial, to all three counts. Catino and Pagano pleaded not guilty and went to trial.

At the end of the Government's case the trial court dismissed the conspiracy count for insufficient evidence. A guilty verdict was returned by the jury against each accused on the count in which he was charged on June 1, 1967. Each was sentenced to five years imprisonment, Pagano on June 30, 1967 and Catino on November 1, 1967, and both have appealed. We affirm.

*The Case Against Catino*

There was evidence from which the jury was entitled to find that Federal Bureau of Narcotics Agent Ioppolo, shortly after 2:00 p. m. on June 13, 1966, was introduced by an informant to the defendant Fimmano at the corner of Burke and Matthews Avenues in the Bronx and that Fimmano thereafter agreed to sell Ioppolo an eighth of a kilogram of heroin for $2,700.

When Agent Ioppolo refused to pay in advance, Fimmano said that he would have to see his "connection," who in turn would have to see the "source of supply." Around 2:45 p. m. Fimmano left, saying that he was going to see his "connection" and that he would be back shortly.

Fimmano drove to the corner of Allerton and Cruger Avenues in the Bronx, where he double-parked his car across the street from the Golden G Restaurant. Catino walked from the Golden G to the open window on the driver's side of Fimmano's car, where he and Fimmano had a conversation. Catino then walked back into the restaurant, conversed with one "Jerry," a part-owner of the Golden G, and again returned to Fimmano's car, where Agent Telb heard him say to Fimmano, "Okay, tonight," after which Catino re-entered the Golden G. Fimmano then drove back to Burke and Matthews Avenues and informed Ioppolo that the deal was set for 8:00 p. m. that evening at the same location.

At approximately 7:30 p. m., Fimmano drove up, parked his car, and joined Catino and Jerry in the Golden G. A few minutes later Catino and Fimmano walked outside and conversed for about 20 minutes. Fimmano then drove to Burke and Matthews Avenues, where, at approximately 8:00 p. m., he told Ioppolo and the informant to drive to the

Roma Pizzeria on Allerton Avenue where the transaction would take place at 9:00 p. m.

After leading Ioppolo and the informant to the Roma Pizzeria, Fimmano drove to 2900 Barnes Avenue. Meanwhile, Catino had walked from the Golden G to 2900 Barnes Avenue, where, after stopping and looking up and down the street, he entered that building. When Fimmano stopped his Mercury opposite 2900 Barnes Avenue, Catino, carrying a brown paper package, came out of the building, crossed the street and entered the car when he placed the package above the right front sun vizor. Fimmano and Catino immediately drove to the corner of Allerton and Holland Avenues where, a little before 8:45 p. m., Fimmano entered the Roma Pizzeria, while Catino stood on the corner, some forty or fifty feet from the Mercury, looking up and down the street.

In the Roma Pizzeria Fimmano told Ioppolo that he had the "stuff." Fimmano then led Ioppolo to the Mercury, removed the brown paper package from above the right front sun vizor and gave it to Ioppolo, who tore a piece of the package so that he could see white powder inside, and then paid over the $2,700 to Fimmano. Following the sale Catino left the corner and walked to the Golden G where he joined Fimmano, who handed him a sum of money part of which Catino gave to Jerry.

After they had left, Agent Ioppolo gave the white powder a field test which showed that the powder was an opium derivative.

*The Case Against Pagano*

There was evidence from which the jury was entitled to find that at approximately 4:00 p. m. on August 31, 1966, Agent Ioppolo and the informant again met Fimmano at Burke and Matthews Avenues; Fimmano agreed to sell Ioppolo two ounces of heroin for $1,300. Fimmano left, saying he was going to

see his "connection," whom the jury could have found to be Catino,[1] and that he would be back in a little while.

Fimmano drove to 2754 Matthews Avenue in the Bronx where he parked his car, entered a building, and, shortly thereafter, walked out of the building with Pagano. Fimmano and Pagano got into the Mercury and Pagano drove back to Burke and Matthews Avenues where, at approximately 4:30 p. m., he dropped off Fimmano. Fimmano joined Ioppolo and said that the person who had just driven away in his automobile was his connection's partner, who was "going to get the stuff." About 6:25 p. m., when Pagano returned to the corner of Burke and Matthews Avenues, Fimmano said to Ioppolo, "Tommy finally got here." Fimmano then left Ioppolo's car and walked to his own car, where Pagano handed him a brown paper package containing heroin which Fimmano delivered to Ioppolo for $1,300.

*Issues on Appeal*

■ The appellants protest that the conspiracy count was included in the indictment in bad faith because it was not alleged "with reasonable expectation that sufficient proof would be forthcoming at trial." United States v. Aiken, 373 F.2d 294, 299 (2 Cir. 1967), cert. denied, 389 U.S. 833, 88 S.Ct. 32, 19 L.Ed. 2d 93 (1967). Although this claim is perhaps arguable, we do not conclude that there was a lack of good faith here. There was evidence in the record that Fimmano referred to Catino as his connection at the time of the June 13 sale and that he spoke of Pagano as his connection's partner during the August 31 sale. Moreover, both purchases were made from Fimmano within a relatively short time, in the same neighborhood and under the same circumstances; Fimmano was not himself the source of supply but arranged for it through connections, and it is clear that Catino and Pagano were not strangers to each

---

1. Catino, whom Fimmano had identified as his connection on June 13, also admitted at trial that he had known Pagano for ten years, and that Pagano had been best man at his wedding.

other but old friends. These facts are sufficient to contradict the assertion that the Government could not reasonably have expected to produce sufficient evidence at the trial to get to the jury on the conspiracy count.

■ Catino and Pagano also argue that the dismissal of the conspiracy count *ipso facto* required the granting of a severance without any showing of specific prejudice. They base their claim on the minority opinion in the five to four decision in Schaffer v. United States, 362 U.S. 511, 518–524, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960), but we see no present reason to depart from the majority opinion in that case, which affirmed United States v. Schaffer, 266 F.2d 435 (2 Cir. 1959) [2] and held, p. 514 of 80 S.Ct., that where the initial joinder of defendants was permissible under Rule 8(b) of the Federal Rules of Criminal Procedure, the test, after dismissal of a conspiracy count before submission to the jury, is whether a severance should have been ordered under Rule 14 of the Federal Rules of Criminal Procedure.[3] See also United States v. Aiken, supra. In *Schaffer* the number of defendants and transactions produced circumstances which the minority of the Court felt were bound to cause confusion in the minds of the jurors and created a danger that the criminal acts of an individual accused were likely to be imputed to other defendants. In the present case, however, there are only two parties and two transactions and the possibility of confusion, if any, is minimal. Compare United States v. Branker, 395 F.2d 881 (2 Cir. 1968).

The appellant Catino claims prejudice on the ground that the principal issue in the case was one of credibility of the several narcotics agents testifying for the Government, on the one hand, against that of himself, on the other hand, when he testified that he had nothing to do with the unlawful transaction, a position he sought to support by an alibi together with testimony from Fimmano, and that it was likely that the jury would have considered that the agents "were apparently not mistaken or lying in connection with their testimony with regard to co-defendant Pagano and the sale of August 31," because Pagano did not take the stand to contradict them. Catino argues that this would be so prejudicial a make-weight that the jury would have decided the credibility issue against him. We consider this a rather remote and speculative possibility, which falls far short of a showing of prejudice, particularly in view of the trial court's charge which clearly and forcibly instructed the jury as to separate consideration of each of the cases.

Catino and Pagano argue that the trial court erred in denying their respective motions at the close of the Government's case for a severance and for a mistrial because the prejudice, which they allege was implicit in the admission of evidence on the conspiracy count, which was dismissed, could not have been cured by the trial judge's limiting instructions in his charge because, adequate as they may have been under former standards, such instructions have been held to be ineffective as a matter of law by the decision of the Supreme Court in May of this year in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In that case Bruton and one Evans were both

2. This Circuit has been reluctant to lay down a hard and fast rule such as that sought by appellants. See, e. g., Application of Gottesman, 332 F.2d 975 (2 Cir. 1964), where a severance was denied even though a new trial would occur anyway because of a mistrial.

3. Rule 8(b) allows the joinder of defendants "in the same indictment * * if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." The appellants were so charged in the indictment. Rule 14 requires a separate trial if "it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together * * *."

convicted, in a joint trial, of armed postal robbery. Evans did not take the stand but a postal inspector testified to Evans' oral confession which implicated both Bruton and himself in the commission of the offense. Although the trial court instructed the jury not to consider the confession against Bruton, the Supreme Court concluded that there was a substantial risk that the jury did consider the incriminating statements against Bruton anyway and that therefore the joint trial brought about a substantial threat to Bruton's right to confront the witnesses against him and deprived him of his constitutional right of cross-examination.

■ The circumstances of the present case, however, are a far call from those in *Bruton*. The Supreme Court in that case recognized that there are cases in which inadmissible hearsay has been let in, which are not within the thrust of the holding. The Court said:

> "Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. 'A defendant is entitled to a fair trial, not a perfect one.' Lutwak v. United States, 344 U.S. 604, 619 [73 S.Ct. 481, 97 L.Ed. 593]; see Hopt v. Utah, 120 U.S. 430, 438 [7 S.Ct. 614, 30 L.Ed. 708] cf. Fed.Rule Crim.Proc. 52(a). It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information."

391 U.S. at 135, 88 S.Ct. at 1627. We conclude that the careful instructions given by the trial judge in the case at bar, where the issues were relatively simple and easily separable, may be assumed to have been effective.

Appellants' principal complaints concern claimed damage to Catino's credibility by reason of his being tried with Pagano, which we have decided was insubstantial, and Ioppolo's testimony that

Fimmano described Catino as his contact and Pagano as Catino's partner. It should be noted that after the dismissal of the conspiracy count, neither defendant at any time moved to strike the testimony nor were any exceptions taken to the judge's charge. While there was hardly sufficient evidence to warrant submission of the charge of conspiracy by the two defendants on trial, there was ample evidence of one conspiracy between Catino and Fimmano and another between Pagano and Fimmano. Moreover, Fimmano was present in court; he testified on behalf of the defendants and could have been examined *in extenso* concerning his statements to Ioppolo, but was not. This case does not present a context in which the holding in *Bruton* is applicable.

■■ Catino and Pagano both argue that because the indictments in this case were obtained after this Court's decision in United States v. Umans, 368 F.2d 725 (2 Cir. 1966), cert. granted, 386 U.S. 940, 87 S.Ct. 975, 17 L.Ed.2d 872, cert. dismissed as improvidently granted, 389 U.S. 80, 88 S.Ct. 253, 19 L.Ed.2d 255 (1967), the indictments should be dismissed, because of the use of hearsay evidence in the testimony of Agent Ioppolo before the Grand Jury when the other surveilling agents who testified at trial were clearly available. In *Umans*, this court stated that:

> "* * * excessive use of hearsay in the presentation of government cases to grand juries tends to destroy the historical function of grand juries in assessing the likelihood of prosecutorial success and tends to destroy the protection from unwarranted prosecutions that grand juries are supposed to afford to the innocent. Hearsay evidence should only be used when direct testimony is unavailable or when it is demonstrably inconvenient to summon witnesses able to testify to facts from personal knowledge."

368 F.2d at 730. We adhere to this view. Because these indictments were returned less than a week after the deci-

sion in *Umans*, however, it would be an unduly harsh exercise of supervisory powers to impose sanctions upon the Government for failing to achieve full compliance in this case. Moreover, Ioppolo was a central, not a peripheral witness, and in his testimony he distinguished between what was hearsay and what was not. Cf. United States v. Malofsky, 388 F.2d 288 (2 Cir. 1968).

■ Catino's next argument is that his post-arrest incarceration for 13 days without a determination of probable cause was a violation of Rule 5(c) of the Federal Rules of Criminal Procedure [4] warranting remedial action by this court in the exercise of its supervisory powers.[5] But we cannot hold that the delay was unreasonable in this case, because it was in large part due to Catino's refusal to accept appointed counsel and the Commissioner's understandable reluctance to have him appear *pro se*.[6]

■ Catino's claim that the trial court erred in denying his mid-trial application to discharge counsel and proceed *pro se* is without merit. There is no absolute right to proceed *pro se* after commencement of trial. The controlling standard was laid down in United States ex rel. Maldonado v. Denno, 348 F.2d 12, 15 (2 Cir. 1965), cert. denied, Di Blasi v. McMann, 384 U.S. 1007, 86 S.Ct. 1950, 16 L.Ed.2d 1020 (1966):

> "The right of a defendant in a criminal case to act as his own lawyer is unqualified if invoked prior to the start of the trial. * * * [citing cases] Once the trial has begun with the defendant represented by counsel, however, his right thereafter to discharge his lawyer and to represent himself is sharply curtailed. There must be a showing that the prejudice to the legitimate interests of the defendant overbalances the potential disruption of proceedings already in progress, with considerable weight being given to the trial judge's assessment of this balance."

Catino's motion was made after three days of trial, in which the Government had completed its direct case. In these circumstances we cannot say that the

---

4. Rule 5(c) provides in pertinent part: "If the defendant does not waive examination, the commissioner shall hear the evidence within a reasonable time."

5. To the extent that the defendants were looking for a preliminary hearing before the indictment to gain a partial discovery of the Government case, see our holding in Sciortino v. Zampano, 385 F.2d 132 (2 Cir. 1967), cert. denied 390 U.S. 906, 88 S.Ct. 820, 19 L.Ed.2d 872 (1968). We are not unaware, however, that there has been adverse criticism of the procedures in some districts for the holding of preliminary hearings and delays of such hearings pending grand jury action. It may be noted that the course now followed in the District of Connecticut appears to be operating satisfactorily. At the initial appearance of the person arrested before the Commissioner, under Fed.Rules Crim.Proc. 5 (a), a date is scheduled for the preliminary hearing, if one is requested, to be held ten days thereafter, if the arrested person remains in custody, and two weeks, if he is not. Within forty-eight hours of the request for a hearing the Government must advise the arrested person or his counsel of its intention to submit the case to a grand jury on a named date; and, if the grand jury returns a true bill before the date assigned for the preliminary hearing, no such hearing will be held. Otherwise the hearing will go forward as scheduled. A prescribed procedure of this kind is helpful in eliminating misunderstandings as well as waste of time and effort, particularly on the part of the Commissioner and defense counsel.

6. Catino was arrested and brought before the United States Commissioner on October 20, 1966. The matter was continued one day in order to permit him to obtain counsel. When Catino appeared without counsel the following day, the Commissioner adjourned the hearing until October 27 when he appointed the Legal Aid Society to represent Catino and again adjourned the hearing until November 2. Neither Catino nor counsel moved to advance the preliminary hearing, despite the Government's indication on October 27 that it would seek a prompt indictment. The indictment was returned on November 2, 1966.

trial court abused its discretion in denying Catino's application, see United States v. Ellenbogen, 365 F.2d 982, 988–989 (2 Cir. 1966), particularly in view of the fact that before the trial Catino had dismissed one Legal Aid attorney for "no cooperation" and had refused to accept the appointment of other counsel.

 Finally, Catino asks this court to review the district court's rulings that two reports of Agent Klempner, Government's Exhibits 19 and 20 for Identification, were not producible under 18 U. S.C. § 3500. However, an examination of the statements reveals that they do not relate to the subject matter of Klempner's testimony. The trial court's ruling was, therefore, correct.

The judgments of conviction are affirmed.