**UNITED STATES of America,
Appellee,**

v.

**Philip ARCURI and Alfred John Cimei,
Defendants-Appellants.**

**Nos. 182, 198, Dockets 32593, 32597.**

United States Court of Appeals
Second Circuit.

Argued Nov. 15, 1968.

Decided Dec. 9, 1968.

Archibald Palmer, New York City, for defendant-appellant Philip Arcuri.

David T. Berman, Brooklyn, N. Y., Berman & Labert, Brooklyn, N. Y., for defendant-appellant Alfred John Cimei.

Donald F. McCaffrey, Asst. U. S. Atty., Joseph P. Hoey, U. S. Atty., Eastern District of New York, for appellee.

Before MEDINA, FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge:

Appellants Arcuri and Cimei were tried in the District Court for the Eastern District of New York for dealing in counterfeit money. The first count of the indictment charged Harriet Schwartz with knowingly possessing and concealing, on or about August 11, 1966, a hundred counterfeit $10 Federal Reserve Notes, knowing them to be such, in violation of 18 U.S.C. § 472. Count Two charged that on or about August 17, 1966, Arcuri and Cimei knowingly possessed and concealed approximately 998 such notes. The third count alleged that between July 25 and August 17, 1966, Schwartz, Arcuri and Cimei conspired to sell, possess, conceal, pass, utter and publish, and to transfer and deliver some 998 counterfeit $10 Federal Reserve Notes. When the case was called for trial before Judge Weinstein, counsel for Mrs. Schwartz moved for a severance on the ground that she was a patient at the Creedmoore State Hospital, a mental institution. The prosecutor joined in the motion in the interest of affording Arcuri and Cimei a speedy trial, which Arcuri had repeatedly requested; they opposed it on the basis that severance would deprive them of her testimony. The court granted the motion, indicating that it would do all within its power to procure the presence of Mrs. Schwartz as a witness if the defense desired her. The jury found Arcuri and Cimei guilty on both counts; they received concurrent sentences of five and two years, respectively.

We deal first with the claim that the court should have dismissed the indictment on the ground that this was based solely on hearsay evidence which was presented as if the witness had personal knowledge. Although the acts leading to the indictment had been observed by two Secret Service Agents still in the Government's employ—D'Amelio, who was acting under cover, and Lightfoot, who was surveilling—the single witness before the grand jury was another agent whose sole qualification was in allegedly being the only one available in the office on the day the case was to be presented. As the district judge said, "In his testimony before the grand jury, he synthesized the reports of those agents who had observed the relevant events. But he spoke as would one who had seen the events he described and a grand juror would not have known that this witness' knowledge was secondhand." 282 F. Supp. 347.

Some years ago the writer of this opinion expressed the view that such misleading of the grand jury called for dismissal of an indictment. United States v. Payton, 363 F.2d 996, 999–1001 (2 Cir.) (dissenting opinion), cert. denied, 385 U.S. 993, 87 S.Ct. 606, 17 L.Ed.2d 453 (1966). Later Judge Waterman, speaking for the court in United States v. Umans, 368 F.2d 725, 730 (2 Cir. 1966), stated in affirming a conviction "[E]xcessive use of hearsay in the presentation of government cases to grand juries tends to destroy the historical function of grand juries in assessing the likelihood of prosecutorial success and tends to destroy the protection from unwarranted prosecution that grand juries are supposed to afford to the innocent. Hearsay evidence should only be used when direct testimony is unavailable or when it is demonstrably inconvenient to summon witnesses able to testify to facts from personal knowledge."[1] The Supreme Court granted certiorari, 386 U.S. 940, 87 S.Ct. 975, 17 L.Ed.2d 872 (1967), but later dismissed the writ as improvidently granted, 389 U.S. 80, 88 S.Ct. 253, 19 L.Ed.2d 255 (1967).[2] Still later another member of this panel dissented from a refusal to dismiss an indictment based almost solely on the hearsay testimony of a surveilling agent when there was no adequate justification for failure to produce the undercover agent having personal knowledge although in that case there was no deception of the grand jury, United States v. Beltram, 388 F.2d 449, 451–454 (2 Cir. 1968) (dissenting opinion of Medina, J.).[3]

■ The majority in the *Beltram* case, although upholding the indictment, noted that it "was returned before * * the decision in Umans," 388 F.2d 449, a

reference which suggests they thought the court's dictum there might have announced a standard to govern the subsequent conduct of Federal prosecutors in this circuit. Similarly, in United States v. Catino, 403 F.2d 491, 496, 497 (2 Cir. 1968), the court, in declining to dismiss two indictments obtained on the basis of hearsay, noted that "[b]ecause these indictments were returned less than a week after the decision in *Umans* * *, it would be an unduly harsh exercise of supervisory powers to impose sanctions upon the Government for failing to achieve full compliance in this case." 403 F.2d 496. Here, in a penetrating opinion, 282 F.Supp. 347 (1968), Judge Weinstein analyzed the vices in the practice the prosecution had followed. He stated he had been "informed that the practice challenged in the present case no longer represents the policy of the United States Attorney in this district and that witnesses with personal knowledge are now relied upon wherever possible." 282 F.Supp. at 350.[4] He found that the defendants had not been prejudiced by the Government's method of presentation since "based upon the available evidence, it is not conceivable that a grand jury would have refused to indict" and "the reports of the government witnesses—supplied to defendants—were so detailed as to afford the equivalent of grand jury testimony for impeachment purposes." Analyzing the precedents, he concluded that *Umans* and *Beltram* fell just short of prohibiting indictments based solely and unjustifiably upon hearsay, and declined to dismiss the instant indictment. Taking note of the fact that this had been obtained some two months after the *Umans* opinion, contrast United States v. Catino, supra,

---

1. We are sure the court meant also that if a witness was not speaking from personal knowledge, he should make that clear.

2. The testimony in *Umans* was such that the grand jury was fully aware of its hearsay character.

3. In United States v. Malofsky, 388 F.2d 288 (2 Cir. 1968), and United States v.

Andrews, 381 F.2d 377 (2 Cir. 1967), this court upheld hearsay indictments in brief *per curiam* opinions. However, both those indictments had been returned before *Umans* was decided.

4. This court has been similarly informed with respect to the Southern District of New York.

he announced, however, that motions to dismiss indictments subsequent to his opinion would "be granted without a showing of prejudice to the defendant if it is clear that hearsay alone was deliberately relied upon when better evidence was readily available for presentation to the grand jury," whereas earlier indictments would be individually considered to determine prejudice. 282 F. Supp. at 351. In light of the precedents we find no sufficient basis for disturbing the court's refusal to dismiss this indictment. We repeat, however, the warnings to prosecutors given in *Umans* and *Catino*.

Cimei but not Arcuri claims the evidence was insufficient. The Government's evidence was this: After preliminaries unnecessary to detail, the undercover agent D'Amelio had arranged with Mrs. Schwartz to pay $2500 in real money on August 17 in exchange for $10,000 in counterfeit $10 Federal Reserve Notes. He drove to the Airport City Diner on the Long Island Belt Parkway towards evening and called Mrs. Schwartz. Agent Lightfoot and another agent, Ballard,[5] were on hand for surveillance. When Mrs. Schwartz arrived and met D'Amelio, she made four or five telephone calls from pay phones in the diner; at least one was to Arcuri. Around 9 P.M. Arcuri and Cimei arrived in a car driven by Cimei, with two women in the back seat. Arcuri waived to Mrs. Schwartz; Cimei drove the car to the back of the diner. A short while later D'Amelio heard Arcuri call "Harriet." Mrs. Schwartz walked to the diner. D'Amelio, whose view was partially obscured, could see her talking only with Arcuri but Lightfoot testified that Cimei was also a party to the conversation. Mrs. Schwartz returned to D'Amelio's car and said "something" to him. She then walked back to where Arcuri and Cimei were standing and talked to Arcuri. Cimei went to the rear of the diner and returned bearing a brown paper bag. Again Mrs. Schwartz went over to D'Amelio's car, said "something" to him, and returned to Arcuri and Cimei. This time Cimei handed her the bag, which she took to D'Amelio. He gave her a key to open the trunk of the car where the money to be used in payment was said to be reposing. As soon as the lid was raised, this being a pre-arranged signal, Lightfoot and other agents pounced on all four and arrested them. The bag contained ten white envelopes, each enclosing approximately ten counterfeit $10 notes; one of the envelopes bore a fingerprint of Arcuri's.

■■■ While the evidence was rather skeletonized due in considerable part to the defense's successful objection to the Government's first effort to elicit what Mrs. Schwartz told D'Amelio and the prosecutor's failure to renew the effort thereafter,[6] we have no difficulty in

---

5. Ballard was dismissed from the Secret Service after being arrested on a charge of unlawfully possessing counterfeit money. Accordingly he was not called by the Government as a witness in this case. Defendant Arcuri tried to subpoena him, but he could not be located.

6. This was doubtless because the judge said he did not think there was enough evidence of conspiracy to make Mrs. Schwartz' statements admissible as those of a co-conspirator, although there was enough to get the conspiracy count to the jury. We have no occasion to consider whether the former ruling was consistent with the test laid down by Judge Learned Hand in United States v. Dennis, 183 F.2d 201, 230–231 (2 Cir. 1950),

aff'd, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), and followed by us in many other cases. See United States v. Nuccio, 373 F.2d 168, 173–174 (2 Cir.), cert. denied, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967), and cases there cited. Since we do not know what D'Amelio would have testified, we also cannot tell whether the conversations would have been inadmissible hearsay at all. See United States v. Costello, 352 F.2d 848, 853–854 (2 Cir. 1965), cert. granted as to another point, 383 U.S. 942, 86 S.Ct. 1195, 16 L.Ed.2d 205 (1966), later dealt with in Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); United States v. Nuccio, supra, 373 F.2d at 170, 173–174. It would be better

holding it sufficient. Cf. United States v. Montalvo, 271 F.2d 922 (2 Cir. 1959); United States v. Lefkowitz, 284 F.2d 310, 315–316 (2 Cir. 1960). The Government's evidence could convince a reasonable juror beyond a reasonable doubt that Mrs. Schwartz was a saleslady for the sources of the counterfeit, that she phoned Arcuri to obtain a delivery of the desired amount, and that Arcuri and Cimei made the delivery, with Cimei being the partner having physical possession. In addition, the jury could well have regarded Arcuri's and Cimei's versions of what went on at the diner as so incredible as to furnish still further support. Cf. Dyer v. MacDougall, 201 F.2d 265, 269 (2 Cir. 1952).[7]

█ Arcuri not only denied participation in the crime charged but asserted that he had never handled counterfeit money or known anyone who had done so. The Government countered, as it had every right to do, with a rebuttal witness who testified to Arcuri's having talked to him about buying counterfeit in late July or early August 1966; on objection by Cimei's counsel, the judge instructed that the evidence was not to be considered against him. We see no reason why this was not sufficient.

██ A confused set of arguments has been presented with respect to the co-defendant Schwartz. The claim that the failure to have her examined with respect to competency to stand trial violated 18 U.S.C. § 4244 encounters the imposing obstacle that she was not tried. The argument that Arcuri and Cimei were prejudiced by the severance of Schwartz collides with Judge Learned

Hand's statement, "No accused person has any recognizable legal interest in being tried with another, accused with him, though he often has an interest in not being so tried * * *." United States v. Bronson, 145 F.2d 939, 943 (2 Cir. 1944). Continuing, Judge Hand said, "but he may of course have a lively interest in securing the attendance at the trial as a witness of another accused." Fully recognizing this, the trial judge did everything possible to make Mrs. Schwartz available. She was brought under subpoena from the Creedmoore Hospital, accompanied by a psychiatrist and a nurse. A lawyer was present on her behalf. The psychiatrist gave his opinion that she was "sufficiently capable of understanding so that she can answer in an intelligent and effective way," and would "understand the nature of the witness' oath and the nature of these proceedings." When questioned by the defense, she claimed the privilege against self-incrimination, as was hardly unexpected under the circumstances, and the judge sustained the claim, as he was bound to do. We do not see why this does not end the matter. See United States v. Bronson, supra, 145 F.2d at 943. However, if we were to assume the psychiatrist was wrong as to Mrs. Schwartz' competency, although there is nothing to suggest this, the defense would be no better off since her testimony would have been equally unavailable in that event.

Other points urged by appellants have been considered but do not warrant discussion.

Affirmed.

---

practice for the court to ascertain this outside the presence of the jury before making an exclusionary ruling.

7. It is settled that a defendant who offers evidence after the denial of a motion for acquittal at the close of the Government's case in chief waives any claim as to the sufficiency of that case considered alone. United States v. Calderon, 348 U.S. 160, 164 n. 1, 75 S.Ct. 186, 99 L.Ed. 202 (1954).