UNITED STATES of America, Plaintiff,

v.

Alfred Joseph SAMANGO, Joe Cerda Avila, Sergio Avila, Stephen James Granat, Mark Stephenson Haller, Jr., Gale Lee Leone, Roger Locke, Ronald Petersen, Joy Merlene Chaban, Toni Denise Lowen, and Stephen Chula, Defendants.

Cr. No. 77–01091.

United States District Court,
D. Hawaii.

May 16, 1978.

William J. Eggers, III, Asst. U. S. Atty., Harold M. Fong, U. S. Atty., D. Hawaii, Honolulu, Hawaii, for plaintiff.

David C. Schutter, Schutter, O'Brien & Weinberg, Honolulu, Hawaii, for defendant Alfred J. Samango.

F. Lee Bailey, Boston, Mass., for defendant Joe Cerda Avila.

Robert L. Shapiro, Los Angeles, Cal., for defendant Sergio Avila.

Max Nakata Garcia, Honolulu, Hawaii, for defendant Stephen James Granat.

Paul McCarthy, Honolulu, Hawaii, for defendant Mark Stephenson Haller, Jr.

Michael D. Hong, Honolulu, Hawaii, for defendant Gale Lee Leone.

David Bettencourt, Brown & Bettencourt, Honolulu, Hawaii, for defendant Roger Locke.

George W. Dixon, Tacoma, Wash., for defendant Ronald Petersen.

John A. Hoskins, Honolulu, Hawaii, for defendant Joy Merlene Chaban.

Wayne Luke, Honolulu, Hawaii, for defendant Toni Denise Lowen.

Stephen D. Quinn, Honolulu, Hawaii, for defendant Stephen Chula.

SAMUEL P. KING, Chief Judge.

### . DECISION ON MOTIONS TO DISMISS INDICTMENT

#### I.

On May 5, 1975, Dionisia Ferrer arrived in Honolulu from Tahiti apparently with thirteen and one-half pounds of cocaine concealed in the false bottoms of her two suitcases. Airport customs officials seized the suitcases, touching off an investigation which three grand juries, two indictments, and eleven defendants later brings before me a motion to quash the second, superseding indictment. For prosecutorial conduct straying beyond permissible bounds, as aggravated by the exclusive use of hearsay testimony before the third grand jury, defendants' motion is granted.

#### The First Grand Jury

After indicting Dionisia Ferrer on August 29, 1975,[1] the first grand jury took testimony on the breadth of a potential conspiracy. On March 19th, Alfred J. Samango appeared before the grand jury. He had approached the Drug Enforcement Administration (DEA), acknowledging some acquaintance with the seizure of cocaine at the Honolulu International Airport. Under a subsequent nonprosecution agreement, Samango was to have cooperated by divulging all his information and participating in any and all criminal proceedings. There had been a falling out, however, regarding what constituted adequate cooperation. Samango's grand jury appearance thus be-

---

1. This indictment is of no interest here.

gan what was to become a cascade of grand jury transcripts that would inundate the third and last grand jury.

To begin the questioning before the first grand jury, the prosecutor did not merely introduce Samango as someone who had come forward with possible information. He instead gave a lengthy description of the initial meeting, agreement, and falling out and read his letter to Samango, which expressed great dissatisfaction with the cooperation thus far.[2] Once testimony began, the first vital question set the tone and style for those that followed:

> *Q* : Would you please tell the grand jury the circumstances which you experienced and witnessed and overheard respecting a number of individuals whose names are: Steve Granat, Mark Haller, [unindicted co-conspirator 1], [unindicted co-conspirator 2], Gail Leone, and [unindicted co-conspirator 3] with respect to the smuggling of 6,093 grams—that is nearly 13½ pounds—of cocaine into the District of Hawaii? Let's start by your telling the grand jury when you first discovered that individuals named or unnamed by me just a moment ago planned to smuggle this cocaine into the United States.[3]

Before answering that question, Samango asked to confer with his attorney. This exchange followed:

2. "By way of introduction, my office has subpoenaed Alfred Samango, who sits here before you this morning, to testify respecting a case which you considered back on March 4th, 1976. I think you considered it, Dionisia Ferrer. That case involved 13½ pounds of cocaine which Miss Ferrer smuggled into Honolulu, and over the period since the return of that indictment by the Grand Jury to the Federal District Court, the United States Attorney's Office has contacted a number of people who we think have some information regarding the importation of that 13½ pounds and also another 13½ pounds which was imported and smuggled into Los Angeles California.

"Now Mr. Samango came to us as a possible person with information regarding this case, and Joel Wong of the Drug Enforcement Administration spoke with him initially on the 29th of October 1975, and through November 27th, 1975 Joel Wong and Mr. Samango met and discussed a number of things, informally, and since that discussion, which the government considered to be less than satisfactory, I wrote Mr. Samango a letter. That letter was dated February 6, 1976:

" 'Mr. Alfred Samango

" 'Dear Sir:

" 'I am in receipt of your recent correspondence which indicates your willingness to cooperate with the Drug Enforcement Administration and the United States Attorney's office respecting a cocaine transaction involving Dionisia Ferrer.

" 'The agreement we have is that you will cooperate in lieu of being named as a co-conspirator in a cocaine transaction emanating out of Tahiti. You were instructed to give Special Agent Joel Wong a signed sworn statement of your knowledge of the parties and activities connected with this cocaine transaction. To date your cooperation has been unsatisfactory. Neither the Drug Enforcement Administration nor this office has authorized your travelling to the mainland and your contacting witnesses in person or by telephone. Neither the Drug Enforcement Administration nor I have made any arrangements with you for reimbursement for expenses which you have incurred, legibly, in connection with your participation and cooperation in this case.

" 'Because of your less than satisfactory cooperation to date, this is to notify you that you must present yourself in person to the office of the Drug Enforcement Administration to Special Agent Joel Wong on or before March 1st, 1976, and make a full statement of your involvement in the case and that of all other participants. In the event that you fail to so appear, all previous arrangements made with this office and the Drug Enforcement Administration will be terminated and you will have to take your chances in defending yourself named as a co-conspirator in this cocaine case,'

"and I signed the letter.

"Mr. Samango sits here before you. He failed to appear on March 1st. Since that time there has been some indication by him that he intended to provide the information which he initially offered so that he would not be named as a co-conspirator in the cocaine case.

"Mr. Samango has engaged counsel and appears here today so we are going to attempt to find out where Mr. Samango stands and that is why we are starting the investigation."

3. Testimony of Alfred J. Samango before the Federal Grand Jury on March 19, 1976, at 7 (Samango's exhibit 4 on Motion To Dismiss the Superseding Indictment).

The names of those to become unindicted co-conspirators are purposely omitted. *See United States v. Chadwick*, 556 F.2d 450 (9th Cir. 1977); *United States v. Briggs*, 514 F.2d 794 (5th Cir. 1975).

*Q*: Mr. Samango, do you intend to confer with him question by question? Just so we know what the timing is here. We have got a lot of business to do and if you intend to do that then it's going to frustrate the proceedings and we have to take some other course of action.

*A*: I don't want to frustrate the proceedings.

*Q*: I am not suggesting that you are going to, sir. I am asking you if you are going to consult with Mr. Hart question by question so we have to take a recess every time I ask you a question.

*A*: I think that would depend on the question. Until we get started I wouldn't have a feel for it. This is the first time I have ever appeared before a grand jury. I tried to cooperate with the special agent and that backfired in my face.

*Q*: Don't mislead the grand jury. I didn't backfire in your face. Mr. Wong asked you to come in and make a signed sworn statement respecting the facts concerning the importation of this 13 pounds. You failed to do that. I sent you a letter. You are here today because you were served with a subpoena.

Now, the question today, sir, is whether or not you intend to cooperate and if so, please tell us how you became aware of the fact that Avila, Granat, Haller, [and four unindicted co-conspirators] planned to affect a cocaine smuggling effort into the United States.

*A*: The question is how?

*Q*: How did you become aware? What were the circumstances surrounding your becoming aware of this transaction taking place?

*A*: Well, I would like to confer with my counsel . . . .

*Q*: Very well.[4]

Once the questioning resumed, Samango acknowledged acquaintance with several of the "conspirators," among them Joe Avila, Stephen Granat, Mark Haller, and Gale Leone. Rather than developing these matters directly, the prosecutor asked about Samango's alleged statements to the DEA agent, Joel Wong. At one point came the following question: "Did you tell Mr. Wong on that same date, the 29th of October, that everyone is afraid of Joe [Avila] because he is capable of killing people?"[5] In each of but two instances, Samango disavowed having made such statements. After at least fifteen such interrogatories, Samango finally asserted his Fifth Amendment privilege.[6]

The questions returned briefly to Samango's acquaintances and the like. To develop testimony on financing a conspiracy, the prosecutor turned to money transactions with a local businessman.[7] The inquiry was inconclusive. Thus ended thirty-four of forty-five pages of testimony. The prose-

**4.** Testimony of Alfred J. Samango, *supra* note 3, at 7–8.

**5.** *Id.* at 24.

**6.** "I think . . . that I would like to exercise my right to the fifth amendment with respect to all the questions concerning my conversations with Joel Wong because there is many, many questions that you are asking me that I don't recall, and rather than me answering I don't recall and seeming like I am dumb—" *Id.* at 26–27.

**7.** *Id.* at 30–34.
DEA agent Joel Wong would later testify before the third grand jury:
Well, we have attempted to try to implicate [that businessman]. However, we don't have enough evidence. What we need is some-body like Samango, who actually received money from [him] to come out and say, "[he] knew." Although he supplied the money, you can't show that he is implicated, because there is no one saying that [that businessman] actually had knowledge that they were going to smuggle the cocaine and that this is what the money was for.
If Samango comes forward and says, "[he] gave me the money knowing that I was going to use the money to smuggle this cocaine," then that is the only way that we can get to [that businessman].
Testimony of Joel Wong before the Federal Grand Jury on December 19, 1977, at 18–19 (Samango's exhibit 3 on Motion To Dismiss the Superseding Indictment).

cutor and the witness bickered for the remaining eleven pages.[8]

The grand jury returned no indictment for a conspiracy.

### The Second Grand Jury and the First Indictment

Unlike the first grand jury, the second returned a conspiracy indictment with three counts. The first count charged eleven defendants with conspiracy to import, possess, and distribute cocaine. 21 U.S.C. §§ 841(a)(1), 846, 952, 960 & 963. According to the indictment, Alfred J. Samango and Joe C. Avila as leaders would issue money and instructions to Stephen Granat and others. They in turn would pass on the money and instructions to the unindicted co-conspirators, who acted as couriers. Samango and Granat would meet with another unindicted co-conspirator to arrange for the manufacture of false-bottomed suitcases, which would be used by the couriers as they returned from such places as Cali, Colombia; Lima, Peru; and Tahiti. The second count charged six of the eleven defendants with the intentional importation of thirteen and one-half pounds of cocaine into Honolulu on May 5, 1975. 21 U.S.C. § 952(a). The third count charged Samango and Joe Avila with deriving substantial income from the continuing criminal enterprise. 21 U.S.C. § 848.

Although easily obtained, the first indictment soon became an embarrassment. On September 14, 1977, the second grand jury reviewed the Samango transcript, two transcripts from related grand jury proceedings on the mainland, and live testimony from DEA agent Joel Wong, Stephen Granat, Gale Lee Leone, and others. That day the second grand jury returned a true bill. Defendants moved immediately to dismiss the indictment on grounds that an unauthorized person had been present in the grand jury room, that the prosecutor had testified through his leading questions, and that agent Joel Wong had made misleading statements. Later, defendants Samango and Haller moved for a court authorized psychiatric examination of Stephen Granat. They argued that Granat was a star witness whose heavy use of a panoply of illicit drugs suggested organic or psychological disorders—a possible explanation for his being unable to recall details while before the second grand jury. While the defendants were busily challenging the indictment, they did not suspect a second threat: the second grand jury proceeding had become a reservoir of what was now at least nine transcripts soon to be unleashed.

### The Third Grand Jury and the Second Indictment

The Government decided to obtain a superseding indictment. On December 12, 1977, the prosecutor left the accumulated transcripts with a third grand jury. Dis-

---

8. Q: Do you remember telling Joel Wong during one of the interviews or conversations that you had with him, that you were to take control of the 13 pounds and move it to Los Angeles?
A: Did I ever say that?
Q: Do you remember telling Mr. Wong that?
A: I don't remember ever saying that to Mr. Wong.
Q: You deny telling him that?
A: I don't remember ever saying that.
Q: Do you deny telling him that?
A: I don't remember ever saying that to Mr. Wong, is my answer.
Q: In the event that you didn't tell Mr. Wong that, is it true that you were responsible for taking control of the 13½ pounds and moving it to Los Angeles?
A: I have no way of saying that that would be true.

Q: Were you responsible for taking control of the 13½ pounds; yes or no?
A: How could I possibly—
Q: Yes or no?
A: I don't understand how I could be—
Q: Were you, because of the arrangements that you made with others, responsible for taking control of the 13½ pounds brought in by Dionisia Ferrer and moving it on to Los Angeles after it was left here by Ferrer or others? Were you responsible for that part of the activity?
A: Well, I think I would have to exercise my right under the fifth amendment to answer a question like that if you are trying to tell me that I am involved in that transaction.

playing little firsthand knowledge, agent Joel Wong again summarized the course of the DEA investigation. On December 19th, just two days before defendants were to challenge the first indictment and enter their pleas, the third grand jury returned its true bill.

## II.

■ A grand jury must be legally constituted, and it must be unbiased. *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956). Grand jury bias as a ground for dismissal of an indictment is the broadest and most difficult to articulate and apply.[9]

■ Determining whether a grand jury is biased requires a global view of the role of the grand jury in our system of justice. The grand jury serves a dual function: determining whether there is probable cause to believe that a crime has been committed while protecting citizens from unfounded criminal prosecutions. *Branzburg v. Hayes*, 408 U.S. 665, 687, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). The adoption of the grand jury "in our Constitution as the sole method for preferring charges in serious criminal cases shows the high place it held as an instrument of justice." *Costello v. United States*, 350 U.S. at 362, 76 S.Ct. at 408. Hypertechnical rules of grand jury bias would enervate the institution. When determining whether a defendant was deprived of an unbiased grand jury, a court may therefore consider as aggravating circumstances matters which alone might as a matter of law or in the particular case be inadequate. It may consider the features of the indictment, the prosecutor's knowledge before going to the grand jury, the

nature and substantiality of the evidence, and procedural irregularities. The test is nonetheless difficult to satisfy, otherwise permissible practices before the grand jury would soon become impermissible. *Cf. United States v. Kennedy*, 564 F.2d at 1335–38 (In light of *Costello* exculpatory evidence not the kind of evidence necessary to a valid indictment).

Although the concept of prosecutorial conduct which deprives the defendant of an unbiased grand jury is a useful one, *United States v. Polizzi*, 500 F.2d 856, 888 (9th Cir. 1974) (bias may be reasonably inferred from prosecutor's conduct), the label "prosecutorial misconduct" is not. The term suggests uncharacteristic, extraordinary, and reprehensible conduct. Usually, the indiscreet prosecutor is just acting like all prosecutors. He has no incentive to present or emphasize exculpatory evidence. *United States v. Y. Hata & Co.*, 535 F.2d 508 (9th Cir. 1976). Since the prosecutor confronts no opposing counsel, no one of equal vigilance is there to stem his excesses. In my view, indictments such as the one here are dismissed for *prosecutorial conduct,* which happens to stray beyond the bounds permitted by the Fifth Amendment.

To contrast the law of the Ninth Circuit and that of the Second is to demonstrate that grand jury bias and the excessive use of hearsay testimony are distinct grounds for dismissing an indictment. The difference between the two circuits finds its origin in *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). There the Supreme Court considered whether a defendant may be required to stand trial and a conviction sustained where only hearsay evidence is presented to the

**9.** Prosecutorial conduct not affecting the grand jury's ability to act impartially, *e. g., United States v. DeMarco*, 401 F.Supp. 505 (C.D.Cal. 1975), does not invoke Fifth Amendment concerns. *But see United States v. Chanen*, 549 F.2d 1306 (9th Cir. 1977) (treating all prosecutorial conduct as fungible), *discussed infra.* Similarly, the question of whether a prosecutor's failure to provide evidence that could traditionally be withheld from a grand jury (*e. g.,* exculpatory evidence) now implicate Fifth Amendment guarantees differs from the specif-

ic question of grand jury bias. *See United States v. Kennedy*, 564 F.2d 1329 (9th Cir. 1977). The former concerns whether the grand jury has sufficient evidence upon which to fairly determine the existence of probable cause. As *Kennedy* explained, courts avoid extensive examination of evidentiary sufficiency. The latter question of grand jury bias involves an inquiry that can be limited to objective indicia of prosecutor-induced bias. For seven factors, see discussion *infra.*

grand jury. As to a Fifth Amendment requirement, the court found no violation. After reviewing the development of grand juries as received from England, the Court concluded that examining the competence or substantiality of grand jury evidence would interfere with the traditional freedom of grand juries, raise opportunities for abuses of criminal practice, and cause substantial delay by requiring preliminary trials to determine the validity of grand jury indictments. *Id.* at 363, 76 S.Ct. 406. The Court did not, however, foreclose any review of grand jury proceedings, for it reiterated the sufficient condition for upholding a grand jury indictment; that an indictment be returned by a legally constituted and unbiased grand jury. *Id.* As to a proposed supervisory rule like that of *McNabb v. United States,* 318 U.S. 332, 340–41, 63 S.Ct. 608, 87 L.Ed. 819 (1943), the Court was similarly unconvinced. Petitioner had presented no persuasive reason to impair the freedom of grand juries. Neither justice nor the concept of a fair trial required such supervision. 350 U.S. at 356, 76 S.Ct. 406.

The first indication that the Second Circuit would establish its own supervisory rule came in *United States v. Payton,* 363 F.2d 996 (2d Cir. 1966). In his dissenting opinion, Judge Friendly discerned a sharp contrast between *Costello* and the case before him. Whereas *Costello* had dealt only with the question of whether hearsay alone could support an indictment, *Payton* involved the unnecessary use of hearsay testimony, for direct testimony had been readily available. Judge Friendly also noted that just as undue interference with grand jury discretion defeats the function of the grand jury, so would the use of hearsay evidence without alerting the grand jury.

After *Payton,* two other judges expressed doubts regarding the indiscriminate use of hearsay in procuring indictments. *United States v. Umans,* 368 F.2d 725, 730 (2d Cir. 1966) (Waterman, J.); *United States v. Beltram,* 388 F.2d 449, 451–54 (2d Cir. 1968) (Medina, J., dissenting). The voices of Judges Medina and Friendly joined in *United States v. Arcuri,* 405 F.2d 691, 693 (2d Cir. 1968). Declining to overrule the district court, *Arcuri* gave a final warning that dismissal "would 'be granted without a showing of prejudice to the defendant if it is clear that hearsay alone was deliberately relied upon when better evidence was available for presentation to the grand jury.'" *Id.* at 694. The warning became reality in *United States v. Estepa,* 471 F.2d 1132 (1972) (Friendly, Waterman & Hays, JJ.) Since *Estepa* the district courts of the Second Circuit have dismissed superseding indictments on at least three occasions. *United States v. Provenzano,* 440 F.Supp. 561 (S.D.N.Y.1977); *United States v. Pastor,* 419 F.Supp. 1318 (S.D.N.Y.1975); *United States v. Gallo,* 394 F.Supp. 310 (D.Conn. 1975).

The Ninth Circuit has expressly rejected a proposed supervisory rule like that of the Second Circuit. *United States v. Chanen,* 549 F.2d 1306 (9th Cir. 1977), involved thrice aborted grand jury proceedings. In May and June of 1974, the Government presented to the grand jury the live testimony of five witnesses, regarding an allegedly false claim brought against the United States in the Court of Claims by a corporation and several of its officers. The Government neither prepared nor requested an indictment. None was returned. Before a second grand jury in October 1975, the Government agent summarized the testimony presented at the previous grand jury and answered questions. The district court dismissed the indictment for two reasons. First, there had been no reporter at the proceedings. Second, the Government had made no effort to procure nonhearsay testimony. Before a third grand jury in April 1976, with a court reporter present, the Government *read* the transcripts from the first grand jury—the transcript of one of the witnesses was deleted. *Id.* at 1308 n. 1. The agent once again appeared, presented the documentary evidence, and answered questions. The grand jury returned a true bill. Once again the district court dismissed the indictment because of the extensive hearsay.

The court of appeals reversed for two reasons, First, *Chanen* presented no specific instance of prosecutorial indiscretion. Second, a supervisory rule was unacceptable.

To delimit prosecutorial discretion in grand jury proceedings, the *Chanen* court contrasted the cases. Beyond permissible limits were *United States v. Wells,* 163 F. 313 (D.Idaho 1908) (prosecutor present during grand jury deliberations), and *United States v. DeMarco,* 401 F.Supp. 505 (C.D. Cal.1975) (penalizing statutory right to change venue by indicting on additional charges). Within the limits were *United States v. Bruzgo,* 373 F.2d 383 (3d Cir. 1967) (threatening grand jury witness and calling him a racketeer), *Laughlin v. United States,* 128 U.S.App.D.C. 27, 385 F.2d 287 (1967) (referring to another grand jury witness as a prostitute), *Coppedge v. United States,* 114 U.S.App.D.C. 79, 311 F.2d 128 (1962) (grand jury witness providing perjured testimony without the prosecutor's knowledge), *cert. denied* 373 U.S. 946, 83 S.Ct. 1541, 10 L.Ed.2d 701 (1963), and *Loraine v. United States,* 396 F.2d 335 (9th Cir.) (wilful suppression of evidence undermining credibility of three crucial witnesses), *cert. denied,* 393 U.S. 933, 89 S.Ct. 292, 21 L.Ed.2d 270 (1968). In light of these cases, the *Chanen* court could not say that the reading of the transcripts rather than the presentation of live testimony amounted to fundamental unfairness justifying dismissal of the indictment.

To decline the proposed supervisory rule, the court noted that the grand jury was an independent and constitutionally established institution, before which the judicial and executive branches had complementary roles. Although the judiciary will intervene when executive actions endanger constitutional rights, the mere use of hearsay evidence does not raise constitutional issues. *Costello v. United States,* 350 U.S. at 363, 76 S.Ct. 406. There being no "prosecutorial misconduct," judicial intervention through a prophylactic rule was unjustified.

■ If the twofold discussion in *Chanen* is meaningful, prosecutorial conduct brushing the bounds set by the Fifth Amendment may exceed those bounds when aggravated by excessive use of hearsay testimony. That problem is most acute where there is a superseding indictment. In determining the propriety of dismissal for prosecutorial conduct causing grand jury bias, the following factors are relevant: (1) whether the grand jury was alerted to a similar indictment by a previous grand jury; (2) whether the prosecutor knew of specific reasons for live testimony; (3) whether the nature of the crime and the relationships among the defendants pose a substantial risk of enhanced prejudice; (4) whether the prosecutor had a reasonable expectation that his course of action would elicit probative as opposed to prejudicial evidence; (5) whether the probative value of the evidence exceeded its prejudicial effect; (6) whether probative and less prejudicial evidence was available through alternative means; and (7) whether prejudicial matters could have been easily excised.

■ As evidence before the third grand jury, the Samango transcript was the primary source of prejudice. Clearly prejudicial remarks directed at a prospective defendant are grounds for dismissing an indictment, particularly when they refer to his privilege against self-incrimination. *United States v. DiGrazia,* 213 F.Supp. 232 (N.D.Ill.1963). After himself testifying about Samango's having sought immunity and refusing to cooperate, the prosecutor belabored Samango's resort to counsel. Rather than develop testimony directly, the prosecutor referred to Samango's alleged statements to the DEA agent—statements Samango repeatedly denied. By using that transcript to procure a superseding indictment, the prosecutor allowed the grand jury to draw further impermissible inferences from Alfred Samango's exercise of his Fifth Amendment privilege. Since the grand jury was free to peruse the transcript as many times as it wanted, without ever having heard a uniform reading of the full set of transcripts, it was allowed to overemphasize this and other prejudice, such as Joe Avila being a "killer" or Samango knowing

a drug financier who just happened to be beyond the law. *See* note 7 *supra*.

■ The Granat transcript deceived the third grand jury. Having reason to suspect the reliability of testimony before a previous grand jury, a prosecutor seeking reindictments should not use transcripts of that testimony after informing the new grand jury that the evidence being presented had once before been considered sufficient to support an indictment.[10] By doing so, he knowingly dissuades the grand jury from considering the sufficiency of evidence and deprives it of any opportunity to assess credibility independently. The proposed indictment submitted to the third grand jury bore the caption "Superseding Indictment." Coming after the first indictment but before the Government sought a superseding indictment, defendants' motion for a psychiatric examination of Stephen Granat provided specific examples of unreliability and warned the prosecutor that Granat's live testimony before a third grand jury might be essential. It was.

Although I denied the defendants' motion as a matter of judicial economy,[11] there were substantial reasons to doubt Stephen Granat's previous testimony. Since extreme drug use can be relevant to competency and credibility, *see generally* Annot., *Use of Drugs as Affecting Competency or Credibility*, 65 A.L.R.3d 705 (1975), I considered the merits of the motion. By all indications, Granat was a walking pharmacopeia of controlled substances. As to co-

caine, he was frequently under its influence while furthering the conspiracy and so indulgent that his teeth began to rot and fall out. During Granat's appearance before the second grand jury, his often skimpy recollections would have rendered his testimony a loose and disjointed narrative had it not been for the prosecutor's leading questions. Since the third grand jury never saw him, it could not easily distinguish this unreliability from the prosecutor's habit of lengthy leading questions. Seeing only a transcript, the third grand jury could not observe Granat's demeanor, gauge the possible extent of drug-induced disability, and independently assess credibility.

The conspiracy indictment fostered a synergism of prejudice. Alleged defendants caught in the web of a conspiracy indictment are peculiarly susceptible to secondary prejudice. *Cf. United States v. Branker*, 395 F.2d 881, 888 (2d Cir. 1968) (at trial). Once the prosecutor introduced the Samango transcript, the resulting prejudice radiated from Samango to all his codefendants. As to Sergio Avila and Stephen Chula, for example, other matters amplified that prejudice. Although the third grand jury received transcripts frequently referring to "Avila," there are two defendants named Avila. Furthermore, it was Granat who supplied the primary evidence implicating Stephen Chula and other defendants tangentially related to the conspiracy. To reinforce the skimpy, unreliable, or prejudicial evidence against these defendants, the prosecutor employed leading questions fre-

---

**10.** Although *United States v. Gallo*, 394 F.Supp. 310 (D.Conn.1975), dismissed an indictment under the supervisory rule of the Second Circuit, it clearly exemplifies prosecutorial conduct brushing permissible bounds. As such, *Gallo* provides further considerations of prejudice.

**11.** As part of their inherent power to conduct full and fair adjudications, federal courts may authorize noncompulsory psychiatric examinations of key government witnesses. *United States v. Benn*, 155 U.S.App.D.C. 180, 183, n. 12, 476 F.2d 1127, 1130 n. 12 (1972) (Clark, J., Bazelon & Wilkey, C. J.). They do so to aid either themselves in determining testimonial competency or the jury in assessing credibility. *Id.* 155 U.S.App.D.C. at 183, 476 F.2d at 1130.

Despite Granat's apparent unreliability, I denied the motion. Since Granat was then in custody without access to drugs, voir dire appeared the appropriate time for me to consider competency. *See State v. Butler*, 27 N.J. 560, 143 A.2d 530 (1958). Had there been doubts then, defendants were free to move once again. As to credibility, since these court-authorized examinations are appropriate only when the witness provides uncorroborated testimony, I preferred that the defendants renew their motion once the bulk of Government witnesses had testified. This would have avoided an unnecessary minitrial in advance to determine the extent of corroboration. *See Ballard v. Superior Court*, 64 Cal.2d 159, 174–75 n. 10, 49 Cal. Rptr. 302, 410 P.2d 838, 848 n. 10 (1966).

quently repeating lists of the prospective defendants.

 No circumstances mitigate the apparent prejudice. Although the rules of evidence—constitutional or otherwise—are generally inapplicable to grand jury proceedings, Fed.R.Evid. 1101(d)(2), *e. g., United States v. Blue,* 384 U.S. 251, 255 n. 3, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966), evidentiary rules illuminate the factors mitigating prejudice. Consequently, when prejudicial matters cannot be excised, when probative value exceeds prejudicial effects, or when less prejudicial evidence was unavailable, the prejudice may be ignored. *See* Fed.R. Evid. 403.

Curing the prejudice from the Granat transcript was a simple matter. If Granat, who was in custody, could not have been produced, alerting the grand jury to the potential weaknesses would have ensured careful scrutiny of the evidence or requests for further evidence if necessary.

 The Samango transcript offered nothing of probative value. A prosecutor may call before the grand jury someone he knows intends to claim the Fifth Amendment privilege. *United States v. Wolfson,* 282 F.Supp. 772, 774 (S.D.N.Y.1967). Until the witness actually testifies, the prosecutor may have an expectation of some useful testimony. For example, the witness may either change his mind or assert his privilege with care and selection. Once the witness' testimony is reduced to writing, however, the prosecutor knows whether he has realized those expectations.

A transcript containing probative and prejudicial evidence presents a prosecutor's dilemma. If he submits the transcript to a subsequent grand jury, the defendants will say he should have edited it. If he edits, they will charge him with tampering. If he withholds it, he loses valuable testimony. The dilemma never arose here. While Samango had acknowledged acquaintance with the other conspirators and a potential drug financier, other transcripts provided proof of those friendships. As to business dealings with the financier, this was only a

hitching post for the DEA agent's testimony that that businessman could not be implicated but was surely involved in drug trafficking. This and the balance of the transcript served no other purpose than calculated prejudice. Like the prosecutor in *Chanen,* the prosecutor should have withheld the transcript from the third grand jury.

 More than etiquette prevents a court from delving too deeply into grand jury proceedings. If grand juries are to function freely and as a separate, constitutionally established institution, judicial intervention must be minimal. *Cf. United States v. Chanen,* 549 F.2d at 1312–13. After determining that prosecutorial conduct strayed beyond permissible bounds, a court should dismiss the indictment even though further inquiry might disclose substantial evidence supporting the indictment.